*34 Vroom.* Flanigan v. Guggenheim Smelting Co.

---

EDWARD FLANIGAN, DEFENDANT IN ERROR, v. THE GUGGENHEIM SMELTING COMPANY, PLAINTIFF IN ERROR.

Argued July 10 and 11, 1899—Decided November 20, 1899.

1. The legislature of New Jersey cannot impair the jurisdiction of a constitutional court.

2. Chapter 139 of the laws of 1899 (*Pamph. L., p.* 323) provides, among other things, that whenever a writ of error shall be issued out of the Court of Errors and Appeals to review a judgment founded upon the verdict of a jury, the plaintiff in error may assign for error that the verdict is against the clear weight of evidence and is excessive, and directs said court to consider the grounds so assigned as fully as like grounds are considered in the Supreme Court on a rule to show cause why a new trial should not be granted, and, if it shall appear that such verdict is against the clear weight of evidence or is excessive, to set aside the verdict and reverse the judgment. *Held,* that this act does not authorize the Court of Errors and Appeals, on writ of error to a judgment of the Supreme Court in a civil action founded on the verdict of a jury, to weigh evidence and consider whether the amount of the verdict is excessive.

3. For the Court of Errors and Appeals to consider and adjudicate upon such assignments of error in such a case, would impair the jurisdiction of a constitutional court by depriving its judgment of the attribute of finality as to fact.

4. Specifically, the effect of the statute would be, in this case, to extend to the Court of Errors and Appeals the right to employ a method of reviewing facts substantially the same as that before enjoyed exclusively by the Supreme Court within itself, and to diminish the authority of the Supreme Court by making such right no longer exclusive.

5. A company which is bound to use reasonable care to furnish a safe ladder for the use of its workmen, is responsible for the negligence of the agents whom it employs to construct such ladder.

6. The plaintiff, who was an employe of the defendant company, was injured by falling from a ladder which the jury might conclude was supplied by the defendant for the use of its workmen.   Questions of fact arose at the trial as to the presence of a structural defect in the ladder, as to the comparative opportunities for inspection possessed by the plaintiff and the defendant or its agents as to the character of the risk, and as to negligence in the conduct of the plaintiff.   *Held*, that under the proof in the case these questions were fairly debatable, and so were for the jury.

7. An employe of the defendant having testified that he examined the ladder after the accident and found that it was unbroken, it was competent to show, on cross-examination, that the witness himself destroyed the ladder immediately after the accident.   Such evidence was proper, as tending to discredit the witness, and also to show why the plaintiff did not produce the ladder in evidence.

8. The trial judge having charged the jury that no inference unfavorable to the defendant arose out of such destruction of the ladder, it is not to be supposed that the admission of such evidence, even if erroneous, could have been injurious to the defendant.

On error to the Supreme Court.

For the plaintiff in error, *Willard P. Voorhees* and *Louis Marshall* (of New York).

For the defendant in error, *Alan H. Strong.*

The opinion of the court was delivered by

ADAMS, J.   The plaintiff, a workman, sued his employer in the Supreme Court to recover damages for personal injury. The ground of action alleged in the declaration is the employer's failure to exercise reasonable care to provide the plaintiff with a ladder safe for use in his work.   The plaintiff had a verdict at the Middlesex Circuit.   The writ of error now brings up the judgment entered thereon.   The plaintiff in error, by its bill of exceptions and assignment of errors, insists that the trial judge erred in the admission and exclusion of evidence, in refusing to nonsuit, in refusing to direct a verdict for the defendant and in his charge.

The motion to nonsuit and the motion to direct a verdict raised the same questions.   Some of them are these: Whether

the plaintiff had proved negligence on the part of the defendant; whether the case disclosed contributory negligence on the part of the plaintiff; whether the accident that occasioned the injury to the plaintiff was an ordinary risk incident to his employment; whether it was an obvious risk of which he had notice, and whether the accident was due to the negligence of the fellow-servants of the plaintiff, for which the defendant is not liable. These same questions, with some amplification, were presented to the trial judge by the requests to charge, and are now raised by exceptions to the charge, on which error has been assigned.

The defendant further assigned for error that the verdict was against the clear weight of evidence, and that it was excessive. In support of its right to make these assignments, the defendant relies on chapter 139 of the laws of 1899 (*Pamph. L., p.* 323), approved March 24th, 1899, which is entitled "A supplement to the act entitled 'An act respecting writs of error' (Revision), approved March twenty-seventh, one thousand eight hundred and seventy-four."

This act reads as follows:

" 1. Whenever a writ of error shall be issued out of the court of errors and appeals to review a judgment founded upon the verdict of a jury, or upon the finding of a court or referee where the trial was held before a court without a jury, or before a referee to whom the cause was referred by consent of the parties, it shall be lawful for the plaintiff in error to assign for error that the verdict or finding is against the clear weight of evidence and to assign that the verdict or finding is excessive, and on such assignments the grounds so assigned shall be considered by said court as fully as like grounds are considered in the supreme court on a rule to show cause granted by said court why a new trial should not be granted; and if it shall appear that the verdict or finding is against the clear weight of evidence or is excessive, the judgment shall be reversed and such verdict or finding shall be set aside; provided, that in case of an excessive verdict or finding the court may, at its discretion, permit a reduction of the amount.

" 2. All acts inconsistent with the provisions of this act are hereby repealed, and this act shall take effect immediately."

The writ of error in this case was sued out after the approval of this act. The two assignments above mentioned are therefore regular if this enactment is valid as applied to this case. It is convenient to consider this question at the outset.

The act declares its purpose, and points out by what procedure that purpose is to be carried out. The purpose, speaking generally, is to obtain in this court a review, not of matter of law, but of matter of fact that has been given in evidence in a civil action that has gone to judgment in a court of inferior jurisdiction. The procedure through which this result is to be reached is by writ of error, and by assignment, not of error in law, but of error as to fact. Speaking specifically of this case, the proposition is that this court, by virtue of this act, under the statutory procedure, must thus review fact given in evidence in a civil action that has gone to judgment founded upon the verdict of a jury in the Supreme Court.

It is evident to any mind acquainted with legal procedure that this act declares a novel purpose, and seeks to secure it through the novel use of an old instrumentality. The purpose is novel, for, in such a case, the review has hitherto been of matter of law, and never of matter of fact. The use is novel, for the instrumentality is a writ of error, " whose sole ability," in the words of Chief Justice Beasley, " always has been and is to bring before the higher court, for review in matter of law, the judgments of inferior jurisdictions." *Falkner* v. *Dorland*, 25 *Vroom* 409, 410. It is evident also that if this act be valid, its necessary effect will be to deprive the judgments of such inferior jurisdictions of the attribute of finality as to fact. This attribute has characterized such judgments since the earliest age of the common law. They have been final as to fact, though not final as to law. It is now proposed that they shall henceforth be final as to neither.

Section 1, of article 7, of the constitution provides that " the judicial power shall be vested in a court of errors and

appeals in the last resort in all causes as heretofore; a court for the trial of impeachment; a court of chancery; a prerogative court; a supreme court; circuit courts, and such inferior courts as now exist, and as may be hereafter ordained and established by law; which inferior courts the legislature may alter or abolish, as the public good shall require."

It will be admitted that these provisions guarantee the integrity of the constitutional courts, of which the Supreme Court is one. Whatever powers that court had, whatever jurisdiction that court exercised, at the date of the adoption of the constitution, were by such adoption incorporated into the fundamental law and ensured against destruction or abridgment except through a change in the fundamental law itself. To abolish the court, to alter its organic character, to impair its jurisdiction, to diminish its authority, are beyond legislative power, because that character, jurisdiction and authority form part of a body of law which, upon wise grounds, has been made immutable by any mere legislative act. For example, it has been held that the legislature cannot constitutionally deprive the Supreme Court of its exclusive right to issue, as heretofore, a prerogative writ, either by denying the use of such writ or by creating in another tribunal a co-ordinate authority to employ it. In *Traphagen* v. *Township of West Hoboken*, 10 *Vroom* 232, 234, Mr. Justice Van Syckel, in delivering the opinion of the Supreme Court, which was subsequently adopted by this court, used this language: "By force of section 1, of article 6, of the new constitution, the nature of the Supreme Court can be altered only by a modification of the constitution itself. Under this constitutional guarantee the powers which inhered in the court at the formation of the constitution must be unassailable by legislation. Asserting its power by means of its prerogative writs, that power would be impaired to the extent that it is restrained in the use of its appropriate process."

The statute that was in that case declared invalid forbade

the use of the writ of *certiorari* to bring up an assessment except within thirty days from the confirmation thereof.

In *Flanagan* v. *Plainfield,* 15 *Vroom* 118, the question was whether the legislature could confer upon the Circuit Court the exclusive power in certain cases to allow a writ of *certiorari.* Mr. Justice Van Syckel, in writing the opinion of the Supreme Court, says: "The power to send these writs cannot be distributed and lodged in other courts at the legislative will. No tribunal of co-ordinate jurisdiction can be erected. The right to invest the Circuit Courts with the *certiorari* power necessarily implies the right to confer it upon other inferior jurisdictions. The announcement of the proposition that to the District Courts of the state may be committed the right to issue writs of *mandamus* and *quo warranto* would create no little surprise. This, it is manifest, would destroy the due subordination of the several courts and disturb the harmony of the judicial system which it is the purpose of the constitution to guard and perpetuate. The dignity of the Supreme Court will fall far below that of the King's Bench if exclusive power in this respect is withheld from it. There can be no contraction of the sphere within which the Supreme Court may dispense its prerogative writs except by extinguishing the tribunals to which they may be sent. A law is equally without authority whether it, in express terms or by its operation and effect, takes away or diminishes the inherent power of the court. A legislative scheme giving to the Circuit Court the use of any of these writs cannot be effectuated without violating fundamental principles."

The following cases illustrate the same rule : *State* v. *Decue,* 2 *Vroom* 302; *Green* v. *Jersey City,* 13 *Id.* 118; *McCullough* v. *Essex Circuit Court,* 30 *Id.* 103. In the recent case of *Reilly* v. *Second District Court of Newark, ante p.* 541, an act, giving an appeal from a District Court to the Circuit Court on matters of law, was held to be constitutional, because it effects a mere change of procedure and does not invade a prerogative of the Supreme Court. It

thus appears that the legislature is without capacity to change the nature of the Supreme Court either by direct abridgment of its original power or by weakening its authority by lodging it co-ordinarily in some other tribunal.

The enactment now under consideration raises a question somewhat different in form from those presented by the cases that are above cited. It does not forbid the exercise of jurisdiction in a specified class of cases. It does not, in form at least, interdict the use of an instrument of procedure, or widen such use by making it no longer exclusive. What the legislature has attempted to do is essentially this : To take away from certain judgments that are within the protection of the constitution a quality that has hitherto inhered in them. The quality that is thus to be abstracted is the attribute of finality as to fact. The act is aimed not at the mere machinery of justice, not at the boundaries of jurisdiction, but at the conclusiveness of the proceeding—at the effect of the record itself. The inquiry, then, is this : Whether a statute, calculated to make a constitutional court subordinate in matters of fact as to which it was originally supreme, does or does not, to that extent, alter the constitution of such court, change its nature, diminish its authority and impair its jurisdiction.

This subject may be regarded from three points of view : That of mere reasoning ; that of historical fact, and that of New Jersey authority. From whatever side the matter is approached the question admits of but one answer.

That which alters the effect of a judgment in respect to important matters that are present in every case and makes such judgment as to them no longer the end of litigation but a mere intermediate phase of legal strife, must, on a rational view of the subject, be thought, just to that extent, to alter the character of the judgment and qualify the authority of the court that has pronounced it. Indeed, it is not easy to imagine a more effective way of making a radical change in the nature and function of a court of justice than to lower the quality of its judgments. For example, what more fatal blow could be struck at the authority of a judicial tribunal than, by

legislative enactment, to deprive its records of all binding force? Such a statute would be an extreme example of a class of cases to which the act under examination belongs.

If the rule prescribed by this statute had been applied at an early day to the courts of England, the legal history of that country would be, in some important respects, essentially different from what it is. It is hardly too much to say that the common law, as an administrative system, would have been revolutionized in certain of it highest departments. The technical writ of error and the practice thereunder would have given way in innumerable cases to a procedure by way of appeal, operating not on law only but also on fact. To use the expressive phrases of the opinion in Flanagan v. Plainfield, "the due subordination of the several courts" would have been destroyed and "the harmony of the judicial system" would have been disturbed. Unless it can be said that all this would have effected no inherent essential change in the judicial constitution that the Supreme Court has inherited from its English prototype, the act under examination cannot be sustained.

It is to be remembered that when we are examining a body of systematic law in order to determine whether certain characteristics are substantial or merely accidental, we use language according to the subject-matter. In such a connection the words "organic," "inherent," "essential" and the like do not import a physical, moral or mathematical necessity, but rather a scientific fitness and congruity, having regard to inveterate usage, historical development and the nature of legal things. If we deal with the matter in this sense, the conclusion is inevitable that judgments of constitutional courts of common law are inherently not reviewable as to the facts. The proof of this is the history of the law itself.

Two cases decided in this court support, by satisfactory authority, the conclusion to which the foregoing considerations lead. One is that of *Harris* v. *Vanderveer's Executor*, 6 *C. E. Gr.* 424, a case interesting as an example of the employment of what may be called the historical method to determine

whether a certain attribute is inherent in a decree. In that case the constitutionality of an act granting an appeal from the Prerogative Court to the Court of Errors and Appeals was sustained on the ground that the decrees of the Prerogative Court were in their nature appealable. It was expressly admitted that if it had appeared in the light of reason and of history that such decrees were inherently not appealable, then the statute would have been invalid. Chief Justice Beasley and Mr. Justice Van Syckel delivered concurrent opinions. The Chief Justice used the following language: "Is there anything, then, in the nature or history of such a tribunal as this which should make its decrees final? I do not mean whether it is proper or politic that they should be so, but is such an incident necessarily inherent in the constitution of the court itself? If we regard it as of ecclesiastical origin, its decisions have no claim to conclusiveness. In the English system the decrees of the Prerogative Court are subject to review in the Court of Delegates. This has been the case since the time of Henry VIII. A Prerogative Court, then, is not and never has been from its constitution a court of the last resort. What, then, has so modified its nature as to bestow upon it such a character in this state? If I could perceive that from its organization, or the character of its jurisdiction, the decrees of this court must be unappealable, I should feel constrained to say that the legislature could not alter their nature and make them appealable. Under such circumstances, a modification of the efficaciousness of the decrees of such a court would be to alter, in an essential manner, the court itself. It would amount to an organic change in a constitutional tribunal. But I do not find anything which leads me to conclude that the decrees of this court are or ever have been final in their nature, and consequently there is nothing in the statute now in question which is calculated to detract from the Prerogative Court any of the powers which have been placed in it by the constitution. The scope of its jurisdiction is not in any degree curtailed; all that is done is to deny to its decisions a quality which has never been claimed.

to appertain to such a tribunal.    When we wish to ascertain
the inherent powers of any of the superior courts, we look of
necessity to their English models.    How otherwise can it be
ascertained what is the character and effect of a judgment of
the Supreme Court of this state?    By what other standard is
the Court of Chancery to be measured?    Is there any other
test, then, to be applied to the decrees of the Prerogative
Court?    I know of none, and if we resort to this test, such
decrees are plainly of an appealable character.    Nor does the
consideration, that an appeal from this court has never hereto-
fore been taken, weigh much with me against this view.    In
the absence of a statute authorizing such an appeal, the super-
intending power of this court would lie in abeyance."

Mr. Justice Van Syckel said : "It may be urged that while
the legislature has power to extend the jurisdiction of this
court, it has no right to abridge the powers of the Prerogative
Court, and that one of the essential powers of that court is
the finality of its decrees.    If, under the English system,
finality has been a feature of the Prerogative Court, the
argument would have great force; but in view of the fact
that the Prerogative Court in England is subject to appellate
jurisdiction, no possible difficulty can be suggested in the
way of subjecting its decrees to appeal here, which would not
have applied with equal force to decrees in chancery, for
both courts were adopted in this state without the right of
appeal."

The function of the legislative act granting an appeal from
the Prerogative Court to the Court of Errors and Appeals
was not, in the view of this court, to create, *de novo*, a right
of appeal, but rather to rouse that right from a state of abey-
ance and set it in action.    The case, then, stands thus:
Whereas, on the one hand, decrees of the Prerogative Court
were inherently appealable, so, on the other hand, judgments
of courts of common law were not inherently not reviewable in
civil actions on writ of error except as to the law.    Both are
historical questions to be determined by the historical sense,
and history leads to no other conclusion, unless we adopt the

extravagant supposition that the right of review as to fact has been existent, though dormant and unsuspected, since the dawn of legal science in England, and that the writ of error has all along been appropriate to a use in which it was never employed, and radically different from that to which it has always been put.

The other case is that of *Central Railroad Co.* v. *Tunison,* 26 *Vroom* 561, which followed and was founded upon Harris *v.* Vanderveer. It is instructive in two respects—first, as a commentary on that earlier decision, and secondly, because it comes very close to the case in hand. The legislative enactment there in question, like that now in view, undertook to confer upon an appellate tribunal the right to deal on writ of error with matters of fact that had before been cognizable only in the inferior jurisdiction. Mr. Justice Van Syckel, in delivering the opinion of this court, said: " In *Harris* v. *Vanderveer, supra,* the Chief Justice, in his opinion, said that the language of the constitution, before quoted, in strictness would not apply to the Prerogative Court, so as to protect its jurisdiction from being impaired. He did not, however, put the right to take an appeal from the Prerogative Court to the Court of Errors and Appeals upon that ground, but he referred to the history of that court, and held that there was nothing in its nature or history which made its decrees final—that finality was not inherent in the constitution of the court. The right to take an appeal in Harris *v.* Vanderveer was put expressly upon the ground that the quality of finality was not incident to the decrees of the Prerogative Court. The Circuit Court is one of the courts of law which is protected in its jurisdiction by the express provisions of the organic law. Its right to dispose finally of a rule to show cause why a new trial should not be granted, and to order judgment final upon a verdict rendered, has always existed and been recognized since its formation, and is beyond the reach of hostile legislation."

It is to be noticed that the statute condemned in the Tunison case and the act of 1899 agree not only in general

result, but in the particular method employed to reach it. The general result is to deprive the judgment of the lower court of its finality as to fact. The special method used to effect this purpose is to confer upon an appellate tribunal the right to resort to a mode of review identical or substantially identical with one that the inferior court had before pursued within itself for the revision of its own proceedings. It is true that this inquiry, when conducted in the Supreme Court, is by rule to show cause, while the statute of 1899 gives the right of review to this court by way of writ of error. But the difference is only in name and form. The two procedures are essentially the same. A writ of error bringing up matter of law is none the less a writ of error because a statute calls it an appeal, and, conversely, a process bringing up matter of fact is not accurately designated when the title of an act calls it a writ of error. *Dodd* v. *Lyon*, 20 *Vroom* 229 ; *Falkner* v. *Dorland*, 25 *Id.* 409.

It may not be amiss, before leaving this branch of the case, to point out the distinction between such examination of facts as this court enters into when the question is, for instance, as to the propriety of a nonsuit, and the examination called for by the statute of 1899. There is a superficial resemblance between the two cases, but it is only superficial. This court, acting under the statute of 1899, would inquire whether in the court below there had been a misjudgment as to fact. In dealing with a writ of error bringing up a judgment of non-suit this court examines the facts to see whether the trial judge has erred in law. *Voorhis* v. *Terhune*, 21 *Vroom* 147.

The conclusion is that chapter 139 of the laws of 1899 is invalid for the purposes of this case, and does not authorize this court, on writ of error to a judgment of the Supreme Court in a civil action founded on the verdict of a jury, to weigh evidence and consider whether the amount of the verdict is excessive.

The case of Falkner *v.* Dorland is an authority for the proposition that the act of 1899 is invalid for defect in its title, because the mode of proceeding authorized in the body

of the act is not recognizable by the name of writ of error, which the title applies to it. As the statute is disapproved on a broader ground, it is unnecessary to consider this question.

This preliminary constitutional inquiry being disposed of it remains to consider the questions raised by the exceptions and by the other assignments of error. The evidence on behalf of the plaintiff was that the ladder, described as a scantling-ladder, which the plaintiff declared in his pleadings to be unsafe, was made, with other such ladders, on defendant's premises—at its carpenter shop, by its carpenters—for use by its workmen and especially by the masons, and that such ladders were issued for such use from said carpenter shop upon orders given by Mr. Tichner, the boss of the laborers. It further appeared in the plaintiff's case that a ladder of the kind described as a scantling-ladder was made of two side-pieces, with spruce cross-pieces nailed on, and that there were in use on defendant's premises as many as twenty other ladders, longer than the scantling-ladders, made with holes bored in the side-pieces into which rungs were mortised. The case on behalf of the defendant supplied further information on this subject. The evidence in defence was that besides some scantling-ladders, made by the masons on their own responsibility, there were two kinds of ladders, made by direction of the defendant in its carpenter shop, for use by its workmen and issued from its carpenter shop, or storeroom, on orders given to the workmen from time to time by Mr. Lee, the superintendent, Mr. Acker, the chief engineer, or the foreman in charge of the work. These ladders were of two kinds. The ladders of one kind were about twenty-five feet long, made of spruce sides, with white oak rungs, which were mortised into holes bored in the side-pieces. There were about two dozen ladders of this kind. Mr. Nolan, a witness for the plaintiff, called a ladder of this sort a "painter's ladder." The ladders of the other kind were sixteen feet long, made of spruce, with rungs halved into the uprights and nailed. There were about a dozen ladders of this last-mentioned kind.

Mr. Acker, the chief engineer, described the scantling-ladders as "flimsy" and said that the one from which the plaintiff fell was twelve or thirteen feet long and was one of the kind that was made by the masons.  He further said that it was strong enough but did not look well.  Mr. Lee, the superintendent, said that the scantling-ladder from which the plaintiff fell was "one of the ordinary ladders that were in common use about the place."  The defendant's smelting works were in process of construction at the time of the accident.  They covered four acres.  Three or four hundred men were employed.  After a new ladder had been issued from the carpenter shop, or storeroom, on the order of the chief engineer, superintendent or foreman, no further account was kept of it, but the men took the ladders, as they could get them, from place to place, wherever the work was going on.

The plaintiff's account of the accident was this : He had been for several days assisting Mr. Barrett, a steamfitter, who was at work on top of the boilers.  Access to the top of the boilers was got by means of a ladder placed against a new brick wall, behind which the boilers stood.  The wall was thirteen or fourteen feet high.  On Saturday, May 11th, 1895, some one took away a twenty-six-foot ladder which the plaintiff had been using in the boiler-room, and left in its place a scantling-ladder, which the plaintiff used on Saturday, Sunday, Monday and Tuesday, running up and down it about thirty times a day.  The plaintiff testified that he had seen this particular ladder, half-made, in defendant's carpenter shop, about two weeks before.  It was about one foot shorter than the new brick wall against which it rested.  At about three o'clock on Tuesday, March 14th, the plaintiff was sent by Mr. Barrett for a chisel.  As he was going up the ladder on his return, with the chisel in one hand, the second cross-piece from the top broke under him and he fell, injuring his back.  As he came down he caught at the top of the brick wall and pulled a brick out.  The plaintiff and Peter Nolan, who was his only other witness to the accident, testified that the cross-piece broke near its left end, where a

nail was driven through it into the side-piece, near a knot in the cross-piece. The cross-piece swung down and hung by its right end, leaving a fragment still attached to the left side-piece. Charles Clegg, a witness for the defendant, testified that he saw the ladder after the accident, and that there was a broken rung, as he calls it, near the top. Mr. Acker, the chief engineer, and Mr. Lee, the superintendent, testified that they examined the ladder after the accident, and that it was then intact. The ladder was not produced at the trial. Mr. Acker said on cross-examination, under objection, that he destroyed the ladder in Mr. Lee's presence, immediately after the accident.

It appears from the foregoing summary that the controverted questions, as to this part of the testimony, were three. First, was the ladder made in the carpenter shop of the defendant by its direction for the use of its workmen and issued to them for such use, or was it made by the masons on their own responsibility? Secondly, was a scantling-ladder, as such, unsuitable for use? Thirdly, did this particular scantling-ladder break? There was evidence from which, at the close of the plaintiff's case, the jury might have answered all these questions in favor of the plaintiff. In other words, there was evidence from which the jury might then have concluded that this ladder was made by the defendant for the use of its workmen, and was issued to its workmen for that purpose; that a scantling-ladder was not, as such, unsuitable for use, and that this ladder broke as the plaintiff testified that it did. When the testimony was all in on both sides, the jury might still not improperly have reached the same conclusions.

There were other questions raised by the exceptions and assignments, either in express terms or by necessary implication. Did the cross-piece break under the plaintiff's weight because a nail that fastened its left end to the side-piece was driven near such a knot in the cross-piece as was shown to have existed? If the proximity of the knot and the nail was a structural defect, was it ascertainable by inspection? And

who had the superior opportunity to detect it, the carpenters who made the ladder or the plaintiff who used it? Was it negligence in an able-bodied workman, in his forty-fifth year, to use a ladder a foot shorter than a new brick wall against which it rested and on or over which the workman had to step from the upper end of the ladder? Was it negligence for such a workman to step on the second round from the top of such a ladder? In view of all the circumstances, was the breaking of the ladder in question one of the ordinary risks of plaintiff's employment, so that he should have anticipated and guarded against it, as such? Was it an obvious risk? These are all questions of fact. The first one calls for the exercise of knowledge as to the properties of ordinary matter. The others are such inquiries as are usually committed to the good sense of a jury. Were these questions, or any of them, so one-sided in favor of the defendant that nothing substantial could be said on the other side? Manifestly not. They were therefore for the jury, and the trial judge did not err in leaving them where they belong.

But it is said that the plaintiff should not have been allowed to recover because the structural defect in the latter, if there was such a defect, was due to the carelessness of the carpenters who made the ladder and who were fellow-workmen of the plaintiff. The rule invoked is the familiar one that a master is not liable to a servant for damages resulting from the negligence of a fellow-servant in the course of the common employment. This rule does not apply to this case. It springs from and is concerned with a breach of the duty of a fellow-workman; not a breach of the duty of the employer. The case of *Olsen* v. *Nixon*, 32 *Vroom* 671, illustrates this. There the fellow-workmen of the plaintiff, in the course of their common employment, and for their own use as well as his, adjusted, from time to time as the work progressed, planks that formed a movable scaffolding along the sides of a vessel in a shipyard. By reason of some misadjustment the plaintiff received an injury for which the employer was held not to be

liable. The accident resulted from a breach by fellow-workmen of their duty, in the course of the common employment. This is a risk that a workman takes when he enters the employment. In *Maher* v. *McGrath,* 29 *Id.* 469, the present Chief Justice distinguished (at *p.* 472) between the case of an appliance like a ladder furnished by the employer and that of a temporary platform which fellow-workmen had to adjust as the work proceeded. The case in hand is essentially different from that of Olsen *v.* Nixon. Here the duty that was unperformed was the duty of the master. The defendant was bound to furnish a ladder. If the ladder that it furnished contained a structural defect whereby the plaintiff, was injured, it is no excuse to say that the carpenters who made the ladder were careless. They were the defendant's agents. The proposition comes to this: That in such a case a principal may escape the consequences of a breach of his own duty by showing that his agents were negligent. If this were true it would be a startling exception to the great rule that underlies the law of agency. But it is not the law. The true criterion is thus compactly stated in the opinion of this court in *Curley* v. *Hoff,* 33 *Vroom* 758, 763: "The test always must be whether the negligent act or omission was in discharge of the master's or the servant's duty." The opinion of the Supreme Court in *Hustis* v. *Bannister Co.,* *ante p.* 465, uses almost the same words. The reasoning of this court in *Steamship Co.* v. *Ingebregsten,* 28 *Vroom* 400, is to the same purport. The head-note of that case reads, in part, as follows: "A master's duty to his servant requires of the former the exercise of reasonable care and skill in furnishing suitable machinery and appliances for carrying on the business in which he employs the servant. If the master selects an agent to perform this duty for him, and the agent fails to exercise reasonable care and skill in its performance, the master is responsible to his servants for the fault." The evidence here is that the carpenters did not themselves use ladders. Their work of building ladders was

therefore not incidental to any use common to them and their fellow-servants. The distinction made in the Ingebregsten case, at page 402, is therefore not applicable. In *Cole* v. *Warren Manufacturing Co., ante p.* 626, it is declared that the defendant's duty to the plaintiff cannot be delegated to fellow-servants to the exculpation of the master.

The doctrine of the Supreme Court of the United States is the same. Mr. Justice Brewer, in delivering the opinion of that court in *Baltimore and Ohio Railroad Co.* v. *Baugh,* 149 *U. S.* 368, said: "In the case of *Hough* v. *Railway Co.,* 100 *Id.* 213, and *Railroad Co.* v. *Herbert,* 116 *Id.* 642, this court recognized the master's obligation to provide reasonably suitable place and machinery, and that a failure to discharge this duty exposed him to liability for injury caused thereby to the servant, and that it was immaterial how or by whom the master discharged that duty. The liability was not made to depend in any manner upon the grade of service of a co-employe, but upon the character of the act itself, and a breach of the positive obligation of the master."

It may, indeed, be true that there will be doubtful cases. A duty may be ambiguous, or may have a double aspect, and be in some sense incumbent both on the master and on the fellow-servant. Such a problem may, perhaps, be solved by determining which duty is paramount over the other. It is enough now to say that this is not such a case.

If the matter be regarded from a slightly different point of view and the accident be thought of as the product of the co-operating negligences of the employer and fellow-servants of the plaintiff, the conclusion is still the same. The rule is thus stated in *Bev. Neg.* 743: "If the negligence of the master combines with the negligence of a fellow-servant and the two contribute to the injury, the servant injured may recover damages against the master." This has been specifically held in several New Jersey cases, among which are *Paulmier* v. *Erie Railway Co.,* 5 *Vroom* 151, and *Cole* v. *Warren Manufacturing Co., supra.*

The trial judge correctly charged that the rule as to the negligence of a fellow-workman had no application to the facts of this case.

The only remaining question that requires attention is raised by an exception to the admission on cross-examination of evidence that Mr. Acker, the chief engineer of the defendant, destroyed the ladder immediately after the accident. The objection was that such matter, being *ex post facto*, would not tend to show negligence on the part of the defendant, and that such an act of destruction would not be of itself an admission binding the defendant. Both these propositions are true. The evidence was admitted with another purpose. The trial judge said in his charge : " I am requested to charge you, and I do so charge, that the jury is not warranted in drawing any inference of negligence against the defendant or that that ladder was broken or defective, from the fact that Mr. Acker destroyed the ladder after the occurrence of the accident. I charge you that you cannot infer anything against the defendant from that fact. I permitted the evidence on that subject because it was the plaintiff's right to prove what had become of the ladder and to show why he did not produce it. I do not say that you may not consider the fact of Acker's destruction of the ladder in reference to his own testimony, but you cannot, from the destruction of the ladder by Mr. Acker, draw any inference against the defendant."

This evidence was competent as tending to weaken the force of Mr. Acker's testimony-in-chief. It was competent, also, as accounting for the non-production of the ladder by the plaintiff. It is true that the plaintiff was not chargeable with the custody of the ladder. Nevertheless, if he could produce it he might do so. It was not error to permit him to show that this was out of his power. Moreover, in view of the guarded language of the charge, the admission of this testimony, even if erroneous, cannot be supposed to have prejudiced the defendant.

The judgment is affirmed.

Whether the "Supplement to the act entitled 'An act respecting writs of error' (Revision), approved March 27th, 1874," which supplement was approved March 24th, 1899, is a valid act so far as it provides for a review of questions of fact of judgments of the Circuit or Supreme Court—

*Aye*—None.

*No*—THE CHIEF JUSTICE, DEPUE, VAN SYCKEL, DIXON, GARRISON, LIPPINCOTT, GUMMERE, LUDLOW, BOGERT, NIXON, HENDRICKSON, ADAMS, VREDENBURGH.   13.

Whether there is error in the judgment—

*For affirmance*—DIXON, GARRISON, LIPPINCOTT, LUDLOW, BOGERT, HENDRICKSON, ADAMS.   7.

*For reversal*—THE CHIEF JUSTICE, DEPUE, VAN SYCKEL, GUMMERE, NIXON, VREDENBURGH.   6.