BOARD OF EDUCATION, BOROUGH OF UNION BEACH, ETC., PLAINTIFF-RESPONDENT, v. NEW JERSEY EDUCATION ASSOCIATION, A CORPORATION, ETC., UNION BEACH TEACHERS ASSOCIATION, FREDERICK L. HIPP AND THREE OTHER INDIVIDUAL DEFENDANTS, DEFENDANTS-APPELLANTS.

Argued October 8, 1968—Decided November 25, 1968.

*Mr. Saul Z. Cohen,* of New York bar, argued the cause for appellants (*Mr. Peter M. Fishbein, Mr. Murray J. Laulicht, Mr. Donald H. Wollett, Messrs. Kaye, Scholer, Fierman, Hays and Handler,* of the New York bar, of counsel; *Mr. Joseph N. Dempsey* and *Mr. Cassel R. Ruhlman, Jr.,* attorneys).

*Mr. Theodore W. Geiser* argued the cause for respondent (*Messrs. Pindar, McElroy, Connell and Foley,* attorneys).

*Mr. Norman Mesnikoff* argued the cause for Monmouth County Chapter, American Civil Liberties Union of New Jersey, *amicus curiae* (*Mr. Lee Holley,* of counsel).

*Mr. Thomas P. Cook* argued the cause for State Federation of District Boards of Education, *amicus curiae.*

The opinion of the court was delivered by

Weintraub, C. J. Plaintiff Board of Education (herein Board) obtained a judgment, after a plenary trial, restraining certain activities by defendants and directing them, in effect, to undo actions already taken. The trial court's opinion is reported in 96 *N. J. Super.* 371 (*Ch. Div.* 1967). We certified defendants' appeal before argument in the Appellate Division.

The Board is a public body, *N. J. S.* 18*A*:10–1, charged with the conduct of the public school system in the Borough of Union Beach. Defendant New Jersey Education Association (NJEA), with a membership of about 57,000, represents teachers and administrators in public schools in New Jersey. Defendant Union Beach Teachers Association (UBTA) represented 46 of the 47 full-time teachers employed by the Board at the time of the events about to be related. It is affiliated with NJEA, and NJEA is affiliated with a national organization, the defendant National Education Association (NEA), with more than a million members. Defendant Haller was the president of UBTA, and the other individual defendants are officers or representatives of NJEA.

I.

In February 1967 a dispute arose between the secretary of the Board and defendant Haller, president of UBTA. Haller was a teacher in plaintiff's system but had not yet acquired tenure. On March 14, 1967 the Board met to consider teacher contracts for the following school year and decided not to offer one to Haller and two other nontenure teachers who were active in UBTA. Haller was so notified on March 29. UBTA held a special meeting of its membership on March 31 at which a lengthy resolution was adopted listing 17 grievances.

The trial court found the resolution to be a sham in its assertion of alleged grievances, which finding is not, however, pivotal in the decision of the case. The grievances had not been presented before and no effort had been made to pursue established grievance procedures. The real controversy, which comes within the general terms of the 17th alleged grievance, involved the Board's decision not to reemploy Haller and the two other teachers. Indeed, at the meeting of March 31 representatives of NJEA scored the decision of the Board not to reemploy a nontenure teacher without giving a reason and on that basis urged the teachers to submit resignations *en masse*. At the Board's meeting of April 4 Haller presented the "grievance" resolution described above, and also the resignations of 36 of the 47 teachers, to be effective on June 3, about two weeks short of the end of the school term. The Board called upon the teachers to withdraw their resignations. A few did, and on April 17, the Board accepted the remaining 31 resignations.

Meanwhile, on April 12 UBTA resolved that "sanctions be imposed" against the Board and requested NJEA to follow suit. On April 21 the NJEA resolved to "impose sanctions" on the Board, and gave wide circulation to its resolution.

We interrupt the chronology to explain what defendants mean by "sanctions." In 1962 the NEA resolved:

"The National Education Association believes that, as a means of preventing unethical or arbitrary policies or practices that have a deleterious effect on the welfare of the schools, professional sanctions should be invoked. These sanctions would provide for appropriate disciplinary action by the organized profession.

The National Education Association calls upon its affiliated state associations to cooperate in developing guidelines which would define, organize, and definitely specify procedural steps for invoking sanctions by the teaching profession."

In its "Guidelines" NEA states:

"As used by a professional education organization, sanctions mean censure, suspension or expulsion of a member; severance of rela-

tionship with an affiliated association or other agency; imposing of a deterrent against a board of education or other agency controlling the welfare of the schools; bringing into play forces that will enable the community to help the board or agency to realize its responsibility; or the application of one or more steps in the withholding of services."

With reference to "sanctions" imposed by NEA upon a school district, the "Guidelines" include the following "types of sanctions":

"3. Notification to certification and placement services of unsatisfactory conditions of employment for educators.

4. Warning to members that acceptance of employment as a new teacher in the school district would be considered as unethical conduct and could lead to discharge from and future refusal of membership in the national professional association.

5. Advice to members presently employed that, if their private arrangements permit, they should seek employment elsewhere."

As to a member of NEA who is guilty of "unethical" conduct, the "sanctions" authorized are private or public censure, suspension from membership or expulsion from membership.

The "Guidelines" deal with the imposition of "sanctions" by a local education association and also by a state association. As to an offending member, the "sanctions" are those just listed, i. e., private or public censure, suspension or expulsion. As to the school districts, the local education association and the state association also impose "sanctions," and we quote the following from the "Guidelines" with respect to such action at the state level:

"3. Notification to state and national accrediting agencies of professionally unsatisfactory conditions in a school district;

4. Withholding of placement services, when the state association maintains a placement office; notice to public and private placement agencies of unsatisfactory conditions in a school district and request to observe professional disapproval;

5. Notification to members of association of unacceptable conditions for employment in such district and the professional significance of accepting or refusing employment in a school district against which sanctions have been invoked."

In harmony with the "Guidelines," NJEA made wide distribution of its notice of imposition of "sanctions" on the school district, sending notices to its 57,000 members, to the presidents and placement directors of all teacher colleges in New Jersey, to like officials and others connected with state preparatory colleges in Pennsylvania, New York, West Virginia, Connecticut, Delaware and Maryland, and to all state association executive secretaries. It sent sanction notices to building representatives in selected key districts surrounding plaintiff school district. It also sent a letter to teachers considering employment by the Board, warning that "If a contract is signed by you while professional sanctions are in effect at Union Beach, you will be in violation of the professional code of ethics."

All of the notices referred to above quoted NEA Resolution 66–16, which reads:

"A violation of sanctions by a member of the profession is a violation of the 'Code of Ethics of the Education Profession.' Therefore, the offering or accepting of employment in areas where sanctions are in effect should be evaluated in terms of the Code, and local, state, and national associations should continue to develop procedures for disciplining members who violate sanctions."

NJEA proclaimed through the local press that it would be "a violation of the professional code of ethics for any teacher to accept employment in Union Beach or for any administrator to offer employment in Union Beach as long as the sanctions which had been invoked were in effect."

II.

■ It has long been the rule in our State that public employees may not strike. We recently refused to hold that teachers are beyond that ban, saying in *In re Block,* 50 *N. J.* 494, 499–500 (1967):

"* * * Nor can defendants claim a right to strike under the State Constitution, *Art.* I, ¶ 19, upon the thesis that they are in private employment because teaching can be pursued under private auspices.

We rejected the relevancy here of the distinction between 'governmental' and 'proprietary' functions in *Delaware River and Bay Authority* [*v. International Organization of Masters, Mates and Pilots*], *supra*, 45 *N. J.*, [138], at 146. When government undertakes itself to meet a need, it necessarily decides the public interest requires the service, and its employees cannot reverse or frustrate that decision by a concerted refusal to meet that need. In any event, teachers are ill-situated to profit from the distinction we have rejected, since the maintenance of a free public school system is mandated by the State Constitution itself. *Art.* VIII, § 4, ¶ 1."

And we have rejected the notion that public employees may resort to strike because they think their cause is just or in the public good. So, in discussing the contempt sentences imposed in *In re Buehrer, 50 N. J.* 501, 508 (1967), we said:

"* * * Defendants say the trial court gave no weight to their claim that they struck and defied the order because of a frustration born of an inability to obtain for the school system what they believed it had to have. The prosecution disputes this claim of high purpose. The trial court of course did not evaluate the teachers' demands upon the Board, and neither do we. The notion that some higher right justifies concerted defiance of law can have no role in the courtroom. It cannot excuse; on the contrary, it emphasizes the deliberate nature of the violation. Nor can it meliorate the wrong, especially when the plea comes from public servants who should set the good example."

Defendants deny there was a "strike." They seek to distinguish the usual concerted refusal to work from what transpired here. As to the teachers employed by the Board, defendants say they merely resigned as of a future date, and with respect to the interference with the Board's recruitment of replacements, defendants, as we understand them, say a refusal to accept employment is inherently different from a quit. But the subject is the public service, and the distinctions defendants advance are irrelevant to it, however arguable they may be in the context of private employment. Unlike the private employer, a public agency may not retire. The public demand for services which makes illegal a strike against government inveighs against any other concerted action designed to deny government the necessary manpower,

whether by terminating existing employments in any mode or by obstructing access to the labor market. Government may not be brought to a halt. So our criminal statute, *N. J. S.* 2A:98–1, provides in simple but pervasive terms that any two or more persons who conspire "to commit any act" for the "obstruction of * * * the due administration of the laws" are guilty of a misdemeanor.

██ Hence, although the right of an individual to resign or to refuse public employment is undeniable, yet two or more may not agree to follow a common course to the end that an agency of government shall be unable to function. Here there was such collective action by agreement both as to the quitting and as to new employment. As to the mass resignations, an agreement to that end must be inferred from the very adoption by the members through their teachers union of the program of sanctions which, despite some verbal obscurity in this regard, quite plainly imports an understanding to withdraw services when the union officialdom "imposes sanctions" upon a school district. The use of "unethical" in condemning new employment because of working conditions must mean it is also "unethical" to continue an existing employment under the same conditions. The full understanding must be that upon the imposition of sanctions, all services will be withdrawn. We have no doubt that the agreement to strike was not articulated because of the established illegality of that course. In any event, if it should be thought the plan did not include the obligation to quit in connection with the imposition of sanctions, we think it clear that the teachers entered into an agreement to quit when they voted in favor of mass resignations and then executed 36 of them. Although the Board accepted the resignations and hence does not ask that that work stoppage be ended, we are satisfied the stoppage was concerted action to an illegal end.

██ And with respect to blacklisting of the school district and the scheme of "sanctions" upon teachers who

offer or take employment with a "sanctioned" school board, it can escape no one that the purpose is to back up a refusal of others to continue to work. At a minimum the object is to withhold additional services a school district may need to discharge its public duty, which, as we have said, is no less illegal. Such an illegal agreement may come into being at the time of the strike or may antedate it. If individuals enter into a union or association on terms that upon the occurrence of some stipulated event or signal they will impede government in its recruitment of services, that very arrangement constitutes an agreement the law denounces. An agreement not to seek, accept, or solicit employment in government whenever the upper echelon of the union makes a prescribed pronouncement is, no less than an accomplished shut-down, a thrust at the vitality of government, and comes within the same policy which denounces a concerted strike or quit or slow-down or other obstruction of the performance of official duties.

The several actions taken pursuant to the so-called "Guidelines" are thus illegal even if tested in isolation from each other. But of course the so-called imposition of "sanctions" upon the Board, the mass resignations, and the threat of "sanctions" upon teachers who offer or accept new employment, are all part and parcel of a single illegal plan to block government.[1] That the conventional terminology of a "strike" nowhere appears is of no moment. The substance of a situation and not its shape must control. A doctrine

---

[1] Defendant Hipp, Executive Director of NJEA, accurately said on an earlier occasion, as the trial court noted (96 *N. J. Super.* at 381) :

"Legality may not be the crucial issue. The argument that extreme sanction is legal while a strike is not is not impressive. Both involve withdrawal of service and in both children miss certain expected schooling. The extreme sanction of resignation of teachers and blackballing of the district, even though it may be legal, can have a far more devastating effect upon children than the typical brief teachers' strike. In my book any work stoppage, legal or illegal, is a strike. A strike is a sanction and extreme sanction is a strike."

designed to protect the public interest is equal to any demand upon it. It does not yield to guise or ingenuity.

██ Defendants complain of the following passage in the trial court's opinion (96 *N. J. Super.*, at 382):

"The actions taken by all of the defendants constituted a coercive activity designed for the sole purpose of compelling the board to act in accordance with their desires. As such it was in violation of *Art.* I, *par.* 19 of the 1947 *New Jersey Constitution* as interpreted by our Supreme Court."

They say that to bar all "coercive activity" intended to "compel" a board to act as they want it to act is so broad, and imprecise, as to deny them their right of speech in violation of the First and Fourteenth Amendments. Individuals, severally or in association, of course have the right to denounce a public body, its officers, and its programs, in the most searing terms, and even with a wide margin of error. See *New York Times Co. v. Sullivan*, 376 *U. S.* 254, 84 *S. Ct.* 710, 11 *L. Ed.* 2d 686 (1964); *Garrison v. Louisiana*, 379 *U. S.* 64, 85 *S. Ct.* 209, 13 *L. Ed.* 2d 125 (1964); *Rosenblatt v. Baer*, 383 *U. S.* 75, 86 *S. Ct.* 669, 15 *L. Ed.* 2d 597 (1966); *Ashton v. Kentucky*, 384 *U. S.* 195, 86 *S. Ct.* 1407, 16 *L. Ed.* 2d 469 (1966); *St. Amant v. Thompson*, 390 *U. S.* 727, 88 *S. Ct.* 1323, 20 *L. Ed.* 2d 262 (1968). Such condemnation may indeed be "coercive" and be intended to "compel" a public agency to bow to the wishes of the critics. It is the right of the individual, and it serves equally the collective interest of society, thus to bring government before the bar of public opinion, thereby to alter its course.

██ But although citizens, individually and in association, may thus seek to "coerce" a public body to their wish, there is no right to achieve that end by disabling the public body from acting at all. There is no right to "compel" government to change its ways by blocking the administration of the law until it yields. And this is all the trial court condemned. It is perfectly clear from its opinion that by "coercive activity" it meant the scheme of sanctions before it

which was intended thus to disable the Board from performing at all by depriving it of necessary personnel. This is evident when the criticized passage is read in the context from which it was lifted, and is made crystal clear by the closing portion of the trial court's opinion which expressly holds only that defendants may not pursue their "sanctions" against the school district or the teachers, must withdraw the "sanctions," and must inform all of the recipients of the notice of "sanctions" that the court has adjudged them to be illegal. The trial court expressly added that "There is no intention, however, of restraining defendants from exercising the right of free speech concerning what they think the conditions are in the Union Beach school system." See 96 *N. J. Super.*, at *pp.* 392–393. The judgment as entered thus confines the restraint,[2] and of course it is the court's judgment, rather than its opinion, which is under review.

What reappears in defendants' argument is a protest that "sanctions" are no more than an expression of disapproval of conditions in the school district and of the conduct of the

[2] The judgment reads:

"(1) all defendants are permanently restrained and enjoined from making any press releases, notices, or statements that 'sanctions' have been or are being applied to the plaintiff;

(2) the defendants, Union Beach Teachers Association, New Jersey Education Association and National Education Association, are hereby permanently restrained and enjoined from in any way threatening censure, expulsion or any other action against any member of the teaching profession who accepts a position with the plaintiff;

(3) the defendants, New Jersey Education Association and National Education Association, are enjoined to distribute to each person or agency to whom each of them distributed the 'Notice of Professional Sanctions' the following notice:

'The Superior Court, State of New Jersey, after full hearing, has determined that the "Notice of Professional Sanctions" imposed by the New Jersey Education Association and the Union Beach Teachers Association upon the Borough of Union Beach, New Jersey, in the spring of 1967 was an illegal act on the part of both the local and the state organizations.

Further, the Court has ordered that the local and state organizations, as well as the National Education Association, be restrained

Board. It is difficult, even in the abstract, to take that view of the terms used. Far from importing a mere denunciation of men and their work, the "imposition of sanctions" imports the imposition of a penalty. Odd though it is, and presumptuous too, for a private group to "impose sanctions" upon government, that is precisely the power defendants claimed to exert, and the "Guidelines" make plain that the penalty intended is the deprivation of public services.

The imposition of "sanctions" was the stipulated signal for unlawful activity. The right to utter even a pleasantry may be lost if it is the agreed call for lawlessness. It need hardly be said that freedom of speech does not include the right to use speech as an instrument to an unlawful end. *Delaware River and Bay Authority v. International Organization of Masters, etc.*, 45 *N. J.* 138, at *pp.* 149–150 (1965). As was said in *Giboney v. Empire Storage and Ice Co.*, 336 *U. S.* 490, 502, 69 *S. Ct.* 684, 691, 93 *L. Ed.* 834, *pp.* 843–844 (1949), and repeated in *Cox v. Louisiana*, 379 *U. S.* 536, 555, 85 *S. Ct.* 453, 13 *L. Ed.* 2d 471, 484 (1965), "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or car-

and enjoined from in any way threatening censure, expulsion or any other action against any member of the teaching profession who accepts employment as a teacher in the Borough of Union Beach, New Jersey.

In addition, the New Jersey Superior Court has permanently restrained and enjoined Union Beach Teachers Association, New Jersey Education Association and National Education Association from making any press releases, notices or statements that "sanctions" have been or are being applied in the Borough of Union Beach, New Jersey.

Because the imposition of such "sanctions" was illegal, the Court has directed New Jersey Education Association and National Education Association to publish and distribute this notice of the Court's determination upon as wide a basis as the "Notice of Professional Sanctions" was originally distributed.'

(4) There is no intention in this judgment to restrain the defendants from exercising their right of free speech concerning what they think the conditions are in the Union Beach School system."

ried out by means of language, either spoken, written or printed."

And we see no substance to defendants' claim that there was no proof of injury and therefore relief should have been denied. This proposition rests upon two bases. One seems to be that an exercise of the constitutional rights of speech and association cannot be restrained unless public injury has been achieved. The other is the maxim that equity will relieve only for irreparable injury.

To begin with, there was harm in that thirty-one teachers resigned *en masse* some two weeks before the end of the school term, and although the Board managed to obtain replacements, it was put to that burden. Moreover, there was interference with the process of recruitment until the temporary injunction issued. Further, one cannot discount the inherent possibility that defendants succeeded in limiting the Board's choice of new employees even though they failed in their effort to dry up the source. At any rate, this is not a case where the right to speak or to assemble is sought to be denied because there might ensue some unintended breach of peace or other unintended public harm. Rather here the conduct was designed to accomplish a public injury. Although a court in its discretion may decline to deal with a vacant threat, it hardly lies with defendants to insist their plan of sanctions is hollow and their claim of power an empty boast. And so, too, with respect to the rule that equity will act only if the injury is irreparable, the maxim does not mean that equity will withhold its hand until a threatened harm is done. It means only that equity will leave the parties to a remedy at law if money damages will adequately compensate for the wrong.

Finally, we see no basis for invoking the clean-hands doctrine. It is enough to say, as the opinion of the trial court adequately reveals, that the doctrine will not be invoked when to do so will injure the public. It would be absurd to subject the public to the wrongs of defendants merely because the Board too may have acted improperly.

## III.

The passage we quoted above from the trial court's opinion included the statement that defendants' illegal activity "was in violation of *Art.* I, *par.* 19 of the 1947 *New Jersey Constitution* as interpreted by our Supreme Court." Defendants say we have never held the Constitution prohibits a strike by public employees. The criticism is correct. In fact we expressly left the question open in *Delaware River and Bay Authority, supra,* 45 *N. J.,* at *p.* 148.

Of course, unless some statute purported to authorize such a strike, it would not help defendants if the ban rested in the common law rather than the Constitution. No such statute existed when this case was tried. Since then the Legislature has adopted *Chapter* 303 of the *Laws of* 1968, and its history invites the question whether the statute impliedly authorized a strike by public employees. At the oral argument defendants conceded the statute carries no such implication, and we agree for the reasons we will presently state. This being our view, the constitutional question need not be faced. Nonetheless, the climate is such that we should decide the question now so that it will be clear whether the Legislature is restrained in this sensitive area by the provisions of *Article* I, ¶ 19.

*Article* I, ¶ 19 reads:

"Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing."

Literally, this provision is one of grant to employees rather than of restraint upon them. It purports only to secure the stated rights of private and public employees from legislative denial. That the rights thus secured as to the public employee are less than those assured the private employee does not mean the Legislature may not close the gap in whole or

in part. Surely we need not add to the literal reading of the provision to give it sense, for the provision is meaningful without embellishment. This being so, we see no basis to say the provision was intended to deny the Legislature the power to grant public employees rights which could be given them in the absence of this provision.

It of course is essential to the constitutional promise of an ordered society that government shall be able to govern, and we may therefore assume the Legislature could not legislate the branches of government into idleness. Strikes do tend to bring government to a halt. Yet it need not follow that the Legislature could not find strikes to be tolerable within certain areas and limits. As to a public service the Constitution does not expressly require to be furnished, the Legislature, which may withdraw the service, may find some interruption should be permitted. And even where the Constitution requires a public service to be rendered, as in the case of free public schools, *Art.* VIII, § 4, ¶ 1, there may be room for legislative judgment as to what interruptions are compatible with the fulfillment of that mandate.

Nothing in the proceedings of the Constitutional Convention suggests the delegates thought *Article* I, ¶ 19 disabled the Legislature from adding to the stated rights of employees. On the contrary, a proposal that strikes by public employees be prohibited was withdrawn when the sponsor was assured the commonlaw prohibition against such strikes would continue notwithstanding the adoption of *Article* I, ¶ 19 and that an attempt to embed that rule in the Constitution would likely lead to a lengthy quarrel. See 1 *Proceedings of the New Jersey Constitutional Convention of 1947, pp.* 660–661.[3] We

---

[3] In this regard, Delegate Nathan L. Jacobs, now a member of our Court, said (the essence of Amendment No. 25 referred to in this excerpt is now *Art.* I, ¶ 19) :

"Mr. Orchard referred to assurances from the floor. I don't know just who is in a position to give him such assurances, but I would like to express my personal opinion as to the two issues which he raised.

ought not to imply a restraint upon the legislative power which the convention did not adopt despite an awareness of the issue.

We should not be thought to recommend legislative departure from the common-law rule. On the contrary we remain satisfied that any concerted action which obstructs or disables government runs strongly against sound public policy. Rather the question is whether this judge-made law is beyond legislative disagreement, and we hold only that it is not. More precisely, we hold that *Article* I, ¶ 19 does not itself embody the judge-made view, and does not prevent the Legislature from according public employees rights the Legislature could have granted if that provision were not in the Constitution. But the subject is so vital that we will not attribute to the Legislature an intent to depart from the common law unless that intent is unmistakable. Hence we said in *Delaware River and Bay Authority, supra,* 45 *N. J.,* at *p.* 148:

"\* \* \* While we are not prepared to accept and do not pass on the Authority's contention that a legislative grant to certain classes of public employees, of full collective bargaining rights including the right to strike, would be violative of *Article* 1, *par.* 19, we are entirely satisfied that such a grant, being a sharp departure from prior law and policy, must be deliberately expressed and is not to be implied."

We turn then to *Chapter* 303 of the *Laws of* 1968. It provides for certain procedures to deal with labor disputes in

First, in so far as the right of the State to regulate public utilities is concerned, I don't think there is any question that it has that right now. It has exercised it; that right will continue, and will not in any wise be altered by the proposed Amendment No. 25.

In so far as the issue as to whether publicly employed persons have the right to strike against the State is concerned. whatever law there is on the subject is uniform to the effect that publicly employed persons have no right to strike against the State. I am certain that proposed Amendment No. 25 will not in any wise alter that phase of the law as it now exists."

the public area. It amended *c.* 100 of the *Laws of* 1941, *N. J. S. A.* 34:13A–1, *et seq.,* which had dealt only with labor disputes in the private sector. As initially proposed, *Chapter* 303 would have amended section 8 of the 1941 act to read (the amendments are italicized) :

"Nothing in this act shall be construed to interfere with, impede or diminish in any way the right of *private* employees to strike or engage in other lawful concerted activities. [*Nothing in this act shall be construed to change or enlarge the rights of persons in public employment as set forth in Article I, paragraph 19 of the Constitution of the State of New Jersey.*]"

The bracketed sentence was deleted from the bill before adoption so that section 8 of the 1941 act remained amended solely by the insertion of "private" before "employees." Since *Chapter* 303 provided for "collective negotiations" between public bodies and representatives of their employees, the Governor was concerned lest the deletion of the bracketed sentence might be read to import in "collective negotiations" a right to strike.[4] The Governor accordingly withheld his approval and proposed this amendment:

"Nothing in this act shall be construed to alter the obligations and duties of persons in public employment under Article I, paragraph 19 of the Constitution of the State of New Jersey as the same has been interpreted by the courts of this State, particularly as bearing upon the absence of a right to strike. This act shall not be construed to confer upon public employees any rights not expressly granted by this act."

---

[4] The Governor's "conditional veto" message reads:
"First, of paramount concern to me is the fact that the bill, as presently drafted, appears to suggest that public employees have a right to strike, contrary to long-established judicial interpretations of the New Jersey Constitution. Whether by indirection or otherwise, the Legislature in a last-minute amendment struck from Senate Bill No. 746 language disavowing any intention upon its part of enlarging upon the rights of public employees under the Constitution. That deletion, considered in conjunction with certain other provisions of the bill, implies that public employees may engage in work stoppages.

48

This amendment was one of a number, relating to sundry aspects of the bill, which the Governor proposed. The Legislature declined to adopt these amendments and overrode the Governor's "conditional veto."

We are satisfied the Legislature's refusal to accept the amendment does not suggest the Legislature intended the implication the Governor sought to foreclose. Apart from the fact that the Legislature may have quarreled with other recommended amendments rather than this one, the Legislature could well have rejected this amendment for the same reason it had deleted the sentence of the original bill which is bracketed in the excerpt quoted above, *i. e.,* that in other respects the bill could be said to give public employees rights beyond those granted by *Article* I, ¶ 19, and that any possible inference that a right to strike was intended was adequately negated by the insertion of the word "private" in the reference to the right to strike in the preceding sentence. Finally, in declining to adopt the Governor's amendment, the legislators could well have relied upon our assurance in *Delaware River and Bay Authority,* quoted above, 45 *N. J.,* at 148, that a grant of a right to strike "must be deliberately expressed and is not to be implied."

IV

The Board asks for an award of counsel ‾fees. An award is not authorized by *R. R.* 4:55–7, as the Board frankly acknowledges. It urges an award to relieve the taxpayers of

The Public and School Employees' Grievance Procedure Study Commission developed a concept of collective negotiations which embraces a bundle of bargaining rights up to but not inclusive of the right of public employees to strike. But for the defects noted in the act, I would assume the Legislature intends that the term 'collective negotiations' be given no greater scope than did the Study Commission. If, however, the Legislature intends more, it should be clearly understood that the Governor of this State will not become a willing partner. I have suggested language which will remove all doubt as to the intention of Senate Bill No. 746 on this subject."

the burden of this litigation. We are not persuaded to depart from the rule.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.