145 N.J. Super. 495 (1976)
368 A.2d 396
BOARD OF EDUCATION OF THE CITY OF ASBURY PARK, PLAINTIFF,
v.
ASBURY PARK EDUCATION ASSOCIATION, RUSSELL LEIDY, PRESIDENT, EDWARD HUDSON, CARLO MANNA, LEWIS GIVLER, ALBERT BROWN, JOHN KNIGHT, LANUEL FERGUSON, ANTHONY GIORDANO, JUDITH YOUNG, ROBERT TAYLOR, THOMAS WALSH, PEOLA SMITH, DANIEL MURPHY, MAX LIDDICK, AND DORIAN PARREOTT, AND ALL OFFICERS, MEMBERS AND AGENTS OF THE ASBURY PARK EDUCATION ASSOCIATION, AS A CLASS, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided November 18, 1976.
*498 Mr. Malachi J. Kenny for plaintiff (Messrs. Murray, Meagher & Granello, attorneys).
Mr. Thomas W. Cavanagh, Jr., for defendants (Messrs. Chamlin, Schottland, Rosen & Cavanagh, attorneys).
YACCARINO, J.S.C.
This case presents the court with two interrelated issues of first impression in this State. First, may teachers properly withhold the performance of "extracurricular" activities while continuing to perform what they contend to be their sole educational responsibility, i.e., the completion of classroom assignments; or does the withholding of such "extracurricular" activities constitute an illegal strike? Second, if the withholding of "extracurricular" activities constitutes an illegal strike, is a court of chancery divested of its inherent jurisdiction to enjoin such activity by virtue of the Public Employer-Employee Relations Act, N.J.S.A. 34:13A-1 et seq., and the regulations promulgated pursuant thereto?
This suit was commenced by way of an order to show cause containing temporary restraints, signed on September 11, 1976. A motion to dissolve the restraints and an application for an order to show cause why certain defendants should not be held in contempt were denied on September 14. The following day plaintiff Board of Education of the City of Asbury Park filed an unfair practice charge with the Public Employment Relations Commission (PERC) against defendant Asbury Park Education Association and its president, defendant Russell Leidy. An amended verified complaint adding additional defendants was filed in this action on September 20.
Part of the September 11 order was stayed pending appeal by a single judge of the Appellate Division on the day it was issued, and a notice of motion for leave to appeal was filed on September 15. The original return date of the order to show cause was postponed by this court pending determination by the Appellate Division. On September 29 *499 the Appellate Division vacated part of the September 11 order, denied the balance of the relief sought, and the matter was remanded for plenary hearing. A plenary hearing was scheduled for October 20; however, on that date counsel stipulated the facts, lengthy oral argument was held, and preliminary restraints were continued pending this decision.
The facts stipulated by counsel may be stated as follows: All of the named defendants have been assigned by plaintiff Asbury Park Board of Education to perform what are commonly known as extracurricular or co-curricular activities for the current school year, or have held similar positions in the past. Tenure does not attach to these positions. The general manner of hiring personnel for such positions is through contracts, or what counsel prefer to refer to as assignment/contracts. Customarily, the board would forward assignment/contracts to the teachers, who would merely execute them and return them to the board. Ordinarily, this would be done prior to the commencement of the school year; however, this year it was not undertaken until September 1. Such assignments are not governed by the teachers' master contract.
All of the named defendants made subject to the September 11 order to show cause containing temporary restraints were appointed to extra-classroom assignments by the board on September 1. None has executed the assignment/contracts or employment contracts forwarded to them, but all performed their assigned duties from September 1 until September 8. These defendants were: Edward Hudson, Head Football Coach; Carlo Manna, Lewis Givler, Albert Brown, John Knight and Lanvel Ferguson, Assistant Football Coaches; Anthony Giordano, Boys Cross-Country Track Team; Judith Young, Girls Cross-Country Track Team; Robert Taylor, Head Soccer Coach; Thomas Walsh, Assistant Soccer Coach; Peola Smith, Girls Tennis Coach; Daniel Murphy, Athletic Custodian; Max Liddick, Athletic Trainer; and Dorian Parreott, Band Master. All of these defendants *500 submitted resignations from their extracurricular assignments on September 13 or 14, 1976.
The order to show cause containing temporary restraints of September 20 added the following named defendants: Jack D. Atwood, Advisor to the Megaphone and Chess Clubs; Stephen D. Kessler, Middle School Soccer Coach; Russell Leidy, Education Association president, Junior and Senior Class Advisor; Donald M. Martin, Boys Middle School Fall, Winter and Spring Intramural Programs; Donald E. Merce, Middle School Student Council and Newspaper Advisor; Leanna Taylor, Girls Middle School Fall, Winter and Spring Intramural Sports Program; Francis Viviano, Middle School Chess Advisor; and Peter Zazzali, Honor Society Advisor and Book Room Manager. Also subject to this order to show cause are certain named defendants who have not to date been assigned to extra-classroom duty by the board for the current school year. The following defendants have held such extra-classroom duties in the past, although such positions do not begin until later in the school year: Joseph Manno, Boys Swimming Coach; Nicholas J. Merli, Head Coach of Indoor and Outdoor Track; Milton Parker, Girls Basketball Coach; Dorian Parreott, one of the original 14 defendants, Tennis Coach; Stuart Tave, Middle School Track Coach; Catherine Unganst, Girls Swimming Coach; and Peter Zazzali, Freshman Track Coach. Two of the above-named defendants have resigned from both present and anticipated extra-classroom assignments. All of these defendants submitted resignations from their extracurricular assignments on September 13 or 14, 1976.
An examination of case law in other jurisdictions leads to the conclusion that school boards may assign teachers to perform extracurricular activities, within certain limitations.
[T]he extra assignment must be reasonable: it (1) must not require excessive hours beyond the normal teaching period; (2) must have some relation to the teacher's interests, abilities and certification; (3) must be made with a purpose beneficial to pupils; (4) must not be discriminatory; and (5) must be professional in nature. [Bolmeier, *501 Teachers' Legal Rights, Restraints and Liabilities, § 9.7 at 125 (1971); (emphasis in original)].
In so holding, courts have based their analyses upon the proposition that extracurricular activities are a fundamental part of a child's education, making the supervision of such activities an integral part of a teacher's duty toward his or her students.
In the leading case, McGrath v. Burkhard, 131 Cal. App.2d 367, 280 P.2d 864 (1955), appellant, shortly after securing tenure, attacked the practice within his school district whereby male teachers could be required to perform certain nonclassroom activities such as the supervision of school football and basketball games. Appellant argued that such assignments did not fall within the scope of his duties as a teacher under the terms of his contract of employment; that such duties were unprofessional in nature; and that the hours required to perform said duties were unreasonable. Appellant claimed that the nonclassroom assignments would take more than eight hours a day to perform competently, causing him to work days, such as Saturdays, holidays and nonteaching days, for which he was not being paid.
After examination of the pertinent statutes, regulations and public policy controlling the teaching profession in that state, the California court rejected appellant's arguments. Importantly, in rejecting the contention that the assigned duties involved unreasonable hours, the court noted:
Teachers are engaged in a professional employment. Their salaries and hours of employment are fixed with regard to their professional status and are not fixed upon the same basis as those of day laborers. The worth of a teacher is not measured in terms of a specific sum of money per hour. A teacher expects to and does perform a service. If that service from time to time requires additional hours of work, a teacher expects to and does put in the extra hours, without thought of measuring his or her compensation in terms of a given sum of money per hour. A teacher's duties and obligations to students and the community are not satisfied by closing the classroom door at the conclusion of a class. The direction and supervision of extra-curricular activities are an important part of his duties. * * * All of *502 this is, of course, subject to the test of reasonableness. [131 Cal. App. at 376, 280 P.2d at 870].
In Parrish v. Moss, 200 Misc. 375, 106 N.Y.S.2d 577 (Sup. Ct., Spec. T.), aff'd without opinion, 279 App. Div. 608, 107 N.Y.S.2d 580 (1951), the court was called upon to determine the validity of regulations submitted by the superintendent of schools and adopted by the board of education which gave a principal the power to assign teachers to extracurricular activities.[1] In upholding the resolution, finding the principal's power to be within the applicable educational laws and the by-laws enacted thereunder, the court discussed the obligations which properly may be imposed upon a teacher, and the parameters of a teacher's duty, as follows:
The hours established in any case must be reasonable. The broad grant of authority to fix `duties' of teachers is not restricted to classroom instruction. Any teaching duty within the scope of the license held by a teacher may properly be imposed. The day in which the concept was held that teaching duty was limited to classroom instruction has long since passed. Children are being trained for citizenship and leadership in such training is the teacher. * * * Any teacher may be expected to take over a study hall; a teacher engaged in instruction in a given area may be expected to devote part of his day to student meetings where supervision of such teacher is, in the opinion of the board, educationally desirable. Teachers in the fields of English and Social Studies and undoubtedly in other areas may be *503 expected to coach plays; physical training teachers may be required to coach both intramural and inter-school athletic teams; teachers may be assigned to supervise educational trips which are properly part of the school curriculum. The band instructor may be required to accompany the band if it leaves the building. These are illustrations of some of the duties which boards of education have clear justification to require of their employees. A board is not required to pay additional compensation for such services. The duty assigned must be within the scope of teachers' duties. Teachers may not be required, for instance, to perform janitor service, police service (traffic duty), school bus driving service, &c. These are not `teaching duties.' The board may not impose upon a teacher a duty foreign to the field of instruction for which he is licensed or employed. A board may not, for instance, require a mathematics teacher to coach intramural teams. Where the service is not part of the duties of a teacher, there is nothing to prevent the board from arranging for such extra service and paying for the same in its discretion... There are some activities that are part of instruction but, by their very nature, may be performed after the close of the regular school session. The athletic program, for instance, in many instances takes place under such circumstances. It has, nevertheless, over the years been always regarded as part of the school curriculum. * * * Coaching in athletic sports is teaching. It, therefore, does not follow that because an activity is conducted after regular class hours, it is not part of the regular curriculum." [200 Misc. at 382, 106 N.Y.S.2d at 584-85 (quoting from unreported opinion of Commissioner of Education) (emphasis in original)].
See also District 300 Education Ass'n v. Bd. of Education, 31 Ill. App.3d 550, 555, 334 N.E.2d 165, 168 (1975) (supervision of certain nonacademic school activities, such as football and basketball games, pep rallies and music programs which took place on Saturdays or weekday evenings, compensated at rate of pay lower than contract pay as teachers, held reasonably related to teaching duties); Pease v. Millcreek Tp. School Dist., 412 Pa. 378, 385-388, 195 A.2d 104, 107-08 (1963) (supervision of off-campus bowling not related to school program); Application of Munter, 225 N.Y.S.2d 1008 (Sup. Ct.), aff'd, 233 N.Y.S.2d 1015 (App. Div. 1962) (teacher may be assigned to duty at board of education headquarters in lieu of classroom duty as being within the scope of a teacher's license).
*504 The framework of the law in New Jersey provides similar guides. New Jersey's Constitution contains an explicit mandate for legislative "maintenance and support of a thorough and efficient system of free public schools." N.J. Const. (1947) Art. VIII, § IV, ¶ 1. To that end the Legislature has vested the government and management of schools in local school boards, subject to rules of the State Board of Education and to the Civil Service statutes. N.J.S.A. 18A:10-1; N.J.S.A. 18A:11-1. Thus, in the absence of specific mandates to the contrary, local boards are empowered to make rules for the government and management of public schools and to perform all acts necessary for the proper functioning of public schools in the district, N.J.S.A. 18A:11-1; to employ and dismiss teachers and fix and alter their compensation and the length of their terms of employment, N.J.S.A. 18A:16-1; to make rules governing the employment, promotion and dismissal, and salaries of teachers, N.J.S.A. 18A:27-4; and to reduce the number of teachers employed in the school district, N.J.S.A. 18A:28-9. It has been pursuant to such authority that local boards of education have assigned teachers to perform extracurricular activities.
In Smith v. Paramus Bd. of Ed., 1968 S.L.D. 62, the Commissioner of Education had occasion to consider the importance of extracurricular activities to students and a teacher's responsibility in relation thereto. The activities challenged in Smith, it may be noted, bear a striking similarity to the extracurricular activities resigned from in the case at bar. They included interscholastic and intramural sports programs, student government, clubs, publications, dramatics, band, orchestra, school dances and concerts. The teachers challenged their assignments on the grounds that, as professionals, they were not legally bound to perform such activities, their professional status dictating that they function in a "consentual" atmosphere; that teachers, as part of their "academic freedom," have much discretion in choosing those activities to be performed beyond normal classroom activities *505 and that such assignments denigrated their professional status.
In rejecting these contentions the Commissioner relied in part upon prior school law decisions recognizing the essential nature of extracurricular activities and the traditional role teachers played in their effectuation:
In Willett v. Colts Neck Board of Education, 1966 S.L.D. 202, 206, the Commissioner held that school affairs such as dances, concerts, dramatic productions, athletic events and the like, although generally referred to as "extracurricular" were better designated "extra-classroom," and are certainly part of the total curriculum. In Dallolio v. Vineland Board of Education, 1965 S.L.D. 18, 20, 21, the Commissioner observed that:
"Teachers in public schools customarily direct or supervise a variety of activities which are a part of the curriculum but which are not necessarily directly related to their classroom teaching assignment. These activities are not limited to the coaching of teams in the various sports but might include an assignment to direct (or coach) the school dramatic productions, to advise the student council, to sponsor one or more school clubs, to direct the school assembly programs, to direct the school orchestra, band, or chorus, to supervise the school publications, and many others. In some instances, these extra responsibilities are considered part of the teacher's total assignment, and no remuneration other than the basic contractual salary is paid for performing them. In most cases, however, and particularly for those assignments which require the expenditure of much additional time beyond the normal school day, such as coaching athletics, extra compensation is customary." [1968 S.L.D. at 65].
This court is in accord with the Commissioner's decision in Smith and the approaches taken by the courts in Burkhard and Moss, supra. Realistically, the term "extracurricular" activity is a misnomer; it is not an "extra" in the life of a student, nor has it traditionally been considered an "extra" for teachers. Such activities are an essential part of a child's overall education. Learning and self-realization cannot take place in a vacuum; rather, they are fostered in an atmosphere of social interaction and furthered by the development of a healthy group orientation. Teachers, therefore, in order to properly fulfill the responsibility they *506 have undertaken to their profession, to their students, and to the community, must necessarily perform those activities deemed necessary and assigned to them by the board of education. For this court to require less would be to lend its hand to the subversion of the educational process.
Of course, the touchstone for the exercise of such power is reasonableness. Assignments must be nondiscriminatory, related to a teacher's interests and expertise, and not require excessive hours. They need not, however, be compensated.
Traditionally, boards of education have had the power to assign teachers to the supervision of extracurricular activities without compensation beyond the yearly contract schedule. Additional pay, customarily, has been awarded only for those assignments which require the expenditure of a great number of hours or those which involve a field unrelated to a teacher's certificate. See McGrath v. Burkhard, supra, 131 Cal. App.2d at 376, 280 P. 2d at 870; Parrish v. Moss, supra, 200 Misc. at 382, 106 N.Y.S.2d at 584-85; Smith v. Paramus Bd. of Ed., supra, 1968 S.L.D. at 65. Such practice has prevailed in the Asbury Park school system. Negotiation of the master contract has never included consideration of compensation for extracurricular assignments. Customarily, teachers who perennially supervised certain activities, and those who undertook activities for the first time, would be mailed an assignment/contract for a certain consideration to be executed and returned to the board. The terms of these employment contracts have not, to date, been subject to negotiation.
Based upon the foregoing considerations, the court holds that extracurricular activities are an integral part of a child's education and are incorporated into the duty to properly teach; that local boards of education may assign said activities, within reason, and may require their performance; and that such assignments may be made without additional compensation. Accordingly, those teachers who resigned in concert from their assigned extracurricular activities *507 demanding increased compensation were without legal authority to do so. They were, as a matter of law, obligated to execute and return to the board of education those assignment/contracts which were forwarded to them.
This is not to say that teachers may not negotiate the subject of extracurricular assignments in the master contract. N.J.S.A. 34:13A-5.3 provides in pertinent part that "[w]hen an agreement is reached on the terms and conditions of employment, it shall be embodied in writing and signed by the authorized representatives of the public employer and the majority representative." As previously noted, this was not done in the Asbury Park school system in regard to extracurricular duties. Instead, the parties chose to rely upon the customary informal practice whereby the board of education delivered completed contracts to the teachers merely to be accepted and returned executed to the board. Had the subject of such assignments been included in the master contract, the matter clearly would fall within the terms and conditions of employment and therefore be negotiable. See Englewood Bd. of Ed. v. Englewood Teachers Ass'n, 64 N.J. 1, 6-7 (1973) (lengthening of teachers' work hours without additional compensation within terms and conditions of employment); Burlington Cty. College Faculty Ass'n v. Bd. of Trustees, 64 N.J. 10, 14 (1973) (board properly negotiated faculty's working terms and conditions, such as compensation, hours, work load, sick leaves, personal and sabbatical leaves, physical accommodations, and grievance procedures; no legal duty to negotiate college calendar); Dunellen Bd. of Ed. v. Dunellen Education Ass'n, 64 N.J. 17, 20, 30 (1973) (extra-duty assignments provided for in written agreement; consolidation of chairmanships predominantly a matter of educational policy); Red Bank Bd. of Ed. v. Warrington, 138 N.J. Super. 564, 574 (App. Div. 1976) (assignment of additional teaching period clearly affects terms and conditions of employment); Bridgeton Education Ass'n v. Bridgeton Bd. of Ed., 132 N.J. Super. 554, 558 (Ch. Div. 1975) (elimination of additional *508 compensation for class of teachers within terms and conditions of employment); Edwards, "The Emerging Duty to Bargain in the Public Sector," 71 Mich. L. Rev. 885, 919-920 (1973).[2]
Having concluded as a matter of law that the performance of extracurricular assignments is an inseparable part of the duty to properly teach, and that these teachers were legally obligated to execute the assignment/contracts forwarded to them in the absence of a contractual provision to the contrary, the issue of whether the resignations from such positions constituted an illegal strike is easily determined.
When government undertakes itself to meet a need, it necessarily decides the public interest requires the service, and its employees cannot reverse or frustrate that decision by a concerted refusal to meet that need. [In re Block, 50 N.J. 494, 499 (1967)].
*509 Moreover, while "the right of an individual to resign or to refuse public employment is undeniable, * * * two or more may not agree to follow a common course to the end that an agency of government shall be unable to function." Union Beach Bd. of Ed. v. New Jersey Education Ass'n, 53 N.J. 29, 38 (1968). Furthermore, where mass resignations are concerned, collective action by agreement may be inferred from the surrounding circumstances. Id.
In this case concerted action is manifest. Twenty-eight teachers resigned from their extracurricular assignments while retaining their classroom teaching positions within a two-day period. In addition, it must be noted that seven of said resignations related to extracurricular positions held in prior years, but to which no formal appointments were yet made by the board, as such positions do not commence until later in the school year. Such facts undeniably evidence concerted action.
Here, the Asbury Park Board of Education has determined the necessity of the various extracurricular activities in the school program and properly assigned these teachers to them. Government having decided that such activities are in the public interest, furthering the constitutional mandate of a "thorough and efficient system of free public schools," N.J. Const. (1947) Art. VIII, § IV, ¶ 1, teachers may not act in concert to thwart that determination. Accordingly, this court holds that the concerted resignations of teachers from their extracurricular assignments constitutes an illegal strike. Cf. Doherty & Oberer, Teachers, School Boards, and Collective Bargaining: A Changing of the Guard 100 (1967).
The second issue facing the court is whether the New Jersey Employer-Employee Relations Act, N.J.S.A. 34: 13A-1 et seq. serves to divest the Chancery Division of its inherent jurisdiction to enjoin an illegal strike, placing that function within PERC's power to issue interim relief. It is strenuously argued that the enactment of PERC provides *510 an adequate remedy at law. The answer to this contention is a clear and unequivocal "no".
It is clear beyond peradventure that the powers of a court of chancery, it being a constitutional court of original general jurisdiction, N.J. Const. (1947), Art. VI, § III, ¶ 2, may not be impaired by the Legislature. E.g., O'Neill v. Vreeland, 6 N.J. 158, 165 (1951); Public Service Electric Co. v. Bd. of Public Utility Comm'rs, 88 N.J.L. 603, 609 (E. & A. 1916); Flanigan v. Guggenheim Smelting Co., 63 N.J.L. 647, 651 (E. & A. 1899); In re Roth, 139 N.J. Eq. 588, 597 (Prerog. 1947); In re Appointment of Vice-Chancellors, 105 N.J. Eq. 759, 766 (Ch. 1930). Moreover, legislation may be enacted to affect the procedure of issuing injunctions; however, such legislation may not impair the court's inherent jurisdiction. See Isolantite, Inc. v. United Electrical Workers, 132 N.J. Eq. 613, 619 (E. & A. 1942); United States Pipe & Foundry Co. v. United Steelworkers of America, 59 N.J. Super. 240, 278 (App. Div. 1960).
The doctrine of primary jurisdiction operates within such strictures.
"Primary jurisdiction" * * * applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. [Woodside Homes, Inc. v. Morristown, 26 N.J. 529, 541 (1958) (quoting from United States v. Western Pacific R.R. Co., 352 U.S. 59, 63-64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956))].
Initially, therefore, it must be observed that placing a matter within the competence of an administrative agency does not divest the jurisdiction of a court  it is merely a legislative declaration, to which deference should be paid wherever possible, that a spirit of comity prevail between branches of government. See, e.g., Robinson v. Cahill, 69 N.J. 133, 162, n. 4 (1975) (Pashman, J., concurring *511 in part only and dissenting). Furthermore, in particular regard to the issue of public employee strikes, judicial deference to an administrative body would deny logic. Confrontation of strike situations requires swift action to protect the public interest, a consideration wholly separate and distinct from the resolution of the underlying dispute. Administrative expertise is not involved, nor is a regulatory scheme apposite. Courts of chancery are particularly equipped to deal with such an emergent situation; equity acts on a moment's notice, and can enforce its orders with like rapidity and decisiveness. Thus, it can be readily understood that even should the Legislature purport to place the power to enjoin illegal strikes in PERC, which this court holds it did not, constitutional considerations mandate that chancery courts maintain their inherent jurisdiction, and practical considerations mandate that that power be exercised as the remedy at law would not be adequate. Therefore, a court of equity would, in good conscience, continue to enjoin illegal public employee strikes.
Second, when the regulation providing for interim relief by PERC is placed into its proper statutory context, it is clear that it has no applicability where public employees are engaged in a strike. N.J.S.A. 34:13A-1 et seq., like public employer-employee relations acts in other jurisdictions, provides fact-finding in public employment disputes as a "strike-substitute," Jascourt, "Fact Finding in Public Education Negotiations Disputes: An Overview," 3 J. of Law and Ed. 263, 268 (1974), it being well settled in this State that public employees, such as teachers, may not strike, Union Beach Bd. of Ed. v. New Jersey Education Ass'n, supra, 53 N.J. at 36-37; In re Block, supra, 50 N.J. at 499-500. Thus, the mechanism established by the Legislature to deal with labor disputes is antithetical to the concept of the strike.[3]
*512 As an alternative to the strike, the Legislature declared it to be the public policy of this State that labor disputes be resolved through voluntary mediation, N.J.S.A. 34:13A-2, and to effectuate that end PERC was granted the following functions:
1. provision of services for the purpose of mediation, fact-finding, and other means of aiding in the settlement of labor disputes, including maintaining a panel of arbitrators from which the parties can select for the arbitration of an impasse in negotiations.

*513 2. determination of the appropriate unit of employees for representation and collective bargaining purposes.
3. conduct of elections to determine employee representation.
4. determination of whether an issue is within the scope of collective negotiations.
5. determination of the validity of charges of unfair labor practices specified in the law. [State of New Jersey, Public Employer-Employee Relations Study Commission: "Report to the Governor and the Legislature" 56-57 (February 2, 1976)].[4]
N.J.S.A. 34:13A-5.4(c) gives PERC the exclusive power to prevent persons from engaging in unfair labor practices, and it may issue cease and desist orders to that end. Disputes as to the scope of collective negotiations are within the power and duty of PERC, N.J.S.A. 34:13A-5.4(d), and the Commission has the power to apply to the Appellate Division for an appropriate order enforcing an order entered in regard to unfair labor practices or scope determinations, N.J.S.A. 34:13A-5.4(f).
The crux of defendant's argument is that PERC has the ability to control strikes by virtue of its ability to grant interim relief in unfair labor practice proceedings and scope proceedings.[5] This contention must be rejected out of hand under the facts of this case since temporary restraints were sought in this court before an unfair labor practice petition was filed with PERC. Be that as it may, it must be held as a matter of law that PERC lacks the authority in any situation to enjoin a strike.
N.J.A.C. 19:14-9.1, adopted pursuant to the authority granted by N.J.S.A. 34:13A-5.2, and curiously similar to our court rule, R. 4:52-1, provides in part:
(a) Upon the filing of an unfair practice charge or during the pendency of an unfair practice proceeding, the charging party may apply *514 to the Commission or its named designee for an order requiring the respondent to show cause why specified interim relief should not be granted pending the disposition of the unfair practice proceeding. The order to show cause shall not, however, include any temporary restraints against the respondent unless the respondent has either been given notice of the application and consents thereto or it appears from specific facts shown by affidavit or other verified pleading that immediate and irreparable damage will probably result to the charging party before notice can be served or informally given and a hearing had thereon. If the order to show cause includes temporary restraints and was issued without notice to the respondent, provision shall be made therein that the respondent shall have leave to move for the dissolution or modification of the restraints on two days' notice or on such other notice as the Commission or its named designee fixes in the order. The order may further provide for the continuation of the restraints until the further order of the Commission or its named designee. The order shall be returnable within such time as the Commission or its named designee fixes, unless within such time the Commission or its named designee on good cause shown extends the time.
Analysis of the statutory scheme establishing PERC makes clear that the Commission was not intended to have the authority to enjoin strikes as a measure of interim relief. Looking to the reason for the remedy provided, it is clear that PERC was designed as an alternative measure to allowing public employees the right to strike or a limited right to strike. Voluntary mediation is the essence of our Public Employer-Employee Relations Act; the act assumes the nonexistence of a strike. Thus, while PERC has jurisdiction over unfair labor practice proceedings and scope of negotiations disputes, the statutory scheme and the rules and regulations adopted thereunder must be interpreted as governing those functions without reference to the existence of a strike. Cf. Union Beach Bd. of Ed. v. New Jersey Education Ass'n, 53 N.J. at 46-48. Where interim relief has been considered by the Commission, it has always been within the context of such proceedings. See Englewood Bd. of Ed. v. Englewood Teachers Ass'n, 135 N.J. Super. 120 (App. Div. 1975) (Commission has ability to grant interim relief during scope of negotiation cases; arbitration restrained); In re Bergenfield Bd. of Ed., PERC No. 90, 1 N.J.P.E.R. 1 (1975) *515 (temporary injunction issued pending disposition of unfair labor charge restraining school district from fixing and determining final budget which does not sufficiently fund negotiated salary schedule); In re Little Egg Harbor Tp., PERC No. 94, 1 N.J.P.E.R. 37 (1975) (union request for interim relief to restrain township from subcontracting sanitation work before hearing on union's charge that township's unilateral action violated Act's good faith negotiation requirement); In re State of New Jersey (Stockton State College) & Council of New Jersey State College Locals, PERC No. 76-6, 1 N.J.P.E.R. 41 (1975), aff'd, 141 N.J. Super. 470 (App. Div. 1976) (interim relief sought staying implementation of new "student contact time" procedure by State pending disposition of unfair practice charges); In re Tenafly Bd. of Ed. & Tenafly Teachers Ass'n, PERC No. 92, 1 N.J.P.E.R. 50 (1975) (grievance arbitration enjoined pending final determination of scope of negotiations petition where bona fide question existed over negotiability of assignment of teachers to early morning supervision duty and circumstances under which teacher may accept compensation for tutoring); In re Stafford Tp. & Communications Workers of America, PERC No. 76-9, 1 N.J.P.E.R. 54 (1975) (township temporarily enjoined from efforts to subcontract work normally performed by unit employees pending disposition of unfair labor charge). Accordingly, since the court finds that the question of strikes by public employees is unrelated to those matters within the jurisdiction of PERC, and that PERC's authority to grant interim relief arises only as to those matters directly related to unfair labor practice proceedings and scope of negotiations determinations, the court holds that PERC's authority to grant interim relief does not in any manner impinge upon this court's inherent power to enjoin strikes in the public sector.
This holding, moreover, is a common-sense approach to the subject. Whether an injunction against a strike by public employees is sought before or after filing an unfair labor practice or scope of negotiations petition is irrelevant. *516 The existence of a strike does not concern PERC whose only function is the voluntary settlement of labor disputes. A proceeding seeking an injunction would concern the immediate parties and the community in general, would be independent of PERC, and would not cause PERC to resort to another tribunal during the pendency of its proceedings. Cf. Englewood Bd. of Ed. v. Englewood Teachers Ass'n, supra, 135 N.J. Super. at 124-25. Moreover, while the court has the power to enjoin an illegal strike, the underlying dispute would still be within the primary jurisdiction of PERC. Patrolman's Benevolent Ass'n of Montclair v. Montclair, 70 N.J. 130, 136 (1976); Apostolico v. Essex Cty., 142 N.J. Super. 296, 302-03 (App. Div. 1976).
Based upon the foregoing, defendant teachers[6] will be permanently enjoined from withholding performance of their assigned extracurricular duties which this court has held to constitute an illegal strike; the unfair labor practice proceeding presently before PERC shall continue, unaffected by this decision.
NOTES
[1] The regulations provided, among other things: (1) every teacher is required to give service outside of regular classroom instruction in the performance of functions which are the essential duties of every teacher; (2) there is an area of teacher service which is important to the well rounded educational program of the students, but in which teachers participate in varied ways according to their interests, capabilities and school programs. The principal has the responsibility and duty to see to it that these activities are carried on. The principal may assign a teacher to reasonable amounts of such service beyond the specified hours of classroom instruction, and the teacher is required to render such service; and (3) in the assignment of teachers to these activities, principals are directed to see to it that insofar as is practicable, such assignments are equally distributed.
[2] Commentators have pointed out:

"Despite difficulties of precise definition, working conditions could normally include the following items:

 Accident benefits Paid absences for
 Additional facilities negotiators
 Book duty Pensions
 Cafeteria duty Personal leave
 Central placement Preparation periods
 Class size Professional meetings
 Compensation for extra Promotions
 duties Relief from nonteaching
 Cumulative absences duties
 Damage to teacher property Sabbatical leave
 Duty-free lunch period Salary schedules
 Hospitalization insurance Seniority
 In-service courses Sick pay
 Jury duty Summer school assignments
 Leave without pay
 Legal assistance for Teacher aides
 teachers Teaching assignments
 Length of school day Teaching hours
 Medical examinations Transfers
 Military leave Washroom facilities

All of these items and many others have been included in one or more collective agreements in education." [Lieberman & Moskow, Collective Negotiations for Teachers: An Approach to School Administration 227 (1966) (emphasis supplied)].
[3] This proposition is made apparent in the study commission's final report:

The Commission has taken careful account of the varying judicial and administrative interpretations related to the legal right of public employees collectively to withhold their services. The Commission on balance believes that neither the public employer nor the public employee has the right to withhold services as a form of coercion to induce settlement of disputes. It recognizes that both public sentiment and judicial opinion may alter over time. This is a contentious issue that is likely to be the subject of continuing legal action.
Governmental employers and employees have a mutual obligation to resolve disputes without interruption of service to the public. Community opinion and the Constitution of New Jersey now support this principle, and the Commission's proposals are predicated on the existence of such a principle in fact and in law. Consequently, the Commission's conclusions and recommendations focus on a system of relationships for resolving disputes compatible with the existing constitutional framework and mindful of the public interest which constrains both public employers and public employees.
The Commission recognizes that unauthorized work stoppages may occur in public employment and effective sanctions may be difficult to administer and enforce. The constructive approach, in the Commission's view, is to provide the fullest and most workable procedure for collective negotiation and resolution of disputes in public employment so that work stoppages may be minimized if not eliminated.
While the rights of persons in public and private employment differ, the Commission holds that the difference should be minimal. The public employer is sovereign, but responsible action by public employees cannot be expected unless they are given the greatest measure of freedom of action consistent with the denial to them of the legal right to strike. [State of New Jersey, Public and School Employee Grievance Procedure Study Commission, "Final Report to the Governor and the Legislature," 14-15 (January 9, 1968)].
See Union Beach Bd. of Ed. v. New Jersey Education Ass'n, supra, 53 N.J. at 44-48.
[4] The unfair labor practices were specifically enumerated in N.J.S.A. 34:13A-5.4 apparently as a direct response to Burlington Cty. Evergreen Park Mental Hosp. v. Cooper, 56 N.J. 579 (1970).
[5] PERC's ability to grant interim relief in scope proceedings was recently upheld in Englewood Bd. of Ed. v. Englewood Teachers Ass'n, 135 N.J. Super. 120 (App. Div. 1975).
[6] It is to be noted that the complaint against Albert Brown was dismissed by the consent of the parties.