In the Matter of RICHARD PARRISH et al., Petitioners, against MAXIMILIAN Moss et al., Constituting the Board of Education of the City of New York, et al., Respondents.

Supreme Court, Special Term, Kings County, June 18, 1951.

*A. Mark Levien* for petitioners.

*John P. McGrath, Corporation Counsel (Daniel T. Scannell* of counsel), for respondents.

KLEINFELD, J.  Petitioners seek an order directing the board of education of the city of New York to annul the resolutions adopted by the said board at a special meeting on May 24, 1951, and for a further order directing the superintendent of schools to refrain from carrying out or enforcing such resolutions.

On May 18, 1951, a written notice was sent to the members of the board of education informing them of a special meeting to be held on May 24, 1951, " for the purpose of considering the adoption of new salary schedules for teachers, et al. and related matters ".  At such meeting the board approved two resolutions which provided for the adoption of " Regulations Submitted by the Superintendent of Schools " and also the suspension of any sections of the by-laws of the board of education which were inconsistent with the regulations as adopted.  At its regular meeting on May 31, 1951, the board of education pursuant to section 9 of the by-laws, by unanimous vote of eight members of the board present, added to the calendar Item " 100 " which provided for readoption by the board of the " Regulations Submitted by the Superintendent of Schools."  After this item was added to the calendar, the board, by a seven to zero vote, with one of the board members abstaining from voting, adopted the resolutions which provide as follows:

SUBJECT: READOPTION OF RESOLUTIONS GOVERNING SERVICE OF TEACHERS OUTSIDE OF REGULAR CLASSROOM INSTRUCTION, ETC.

The Board of Education at the adjourned special meeting on May 24, 1951, adopted the following resolutions submitted by the superintendent of schools:

RESOLVED, That the following regulations submitted by the superintendent of schools and governing service of teachers outside of regular classroom instruction are hereby approved; and

RESOLVED, That any inconsistent provisions of the by-laws be, and they are hereby, suspended:

REGULATIONS SUBMITTED BY THE SUPERINTENDENT
OF SCHOOLS

1. Every teacher is required to give service outside of regular classroom instruction in the performance of functions which are the essential duties of every teacher.

2. There is an area of teacher service which is important to the well-rounded educational program of the students, but in which teachers participate in varied ways according to their interests, capabilities and school programs.  The prin-

cipal has the responsibility and duty to see to it that these activities are carried on. The principal may assign a teacher to reasonable amounts of such service beyond the specified hours of classroom instruction, and the teacher is required to render such service.

3. In the assignment of teachers to these activities, principals are directed to see to it that insofar as is practicable, such assignments are equitably distributed.

4. Principals are directed to keep records of all assignments and service under Regulation 2, including the type of service, date or dates, and approximate time spent beyond the regular hours of classroom instruction. Such records should be reported at the end of each school year to the associate superintendent in charge of a division with a copy to the assistant superintendent. Each teacher is to be given a copy of the report with respect to her own services. Blanks will be provided for such school and individual reports.

5. Questions as to the interpretation of the above rules and regulations should be referred by principals and teachers to the assistant superintendent for consideration.

Since this special meeting of May 24, 1951, some questions have arisen as to the procedural steps followed in adopting these resolutions. In order to avoid any delay in putting into effect the regulations heretofore adopted, the following resolutions are submitted for amendment and readoption:

RESOLVED, That the Board of Education hereby amends and readopts the resolutions set forth above; and be it further

RESOLVED, That sections 90 and 91 of the by-laws to the extent that they may be inconsistent with the foregoing resolutions, as to the time necessary to carry out these regulations or in any other respect, are hereby suspended.

Petitioners argue, first, that the resolutions in question were illegally adopted by the board at its meeting on May 24, 1951, in that neither the nature nor substance of the resolutions was stated in the notice of the meeting as required by section 4 of the board's by-laws; second, that the resolutions of May 31, 1951, were approved in violation of section 127 of the by-laws, and third, that the regulations are invalid in that they unlawfully delegate to the individual principals of the schools the power to fix the duties and hours of the teachers without providing for adequate protection of the teachers.

As to petitioners' first contention, when the board of education at its regular meeting on May 31, 1951, by the unanimous consent of the eight members present, voted to add to the calendar the matter of the regulations submitted by the superintendent of schools and then, by a vote of seven to zero, readopted these regulations, the board cured any procedural defects that may have existed in the resolutions adopted on May 24, 1951. In adding the item with respect to the aforementioned regulations to the calendar of May 31, the board followed the procedure outlined in section 9 of the by-laws, which provides that an item not calendared for a regular meeting may be considered

by the board by unanimous consent. Section 9 reads: " On the Monday previous to each regular meeting, the Secretary shall prepare a calendar for the meeting and no items shall be considered that are not calendared, except upon the recommendation of the President or the chairman of the appropriate committee and by unanimous consent."

The purport of section 9 seems clear when we examine section 4 of the by-laws which states that no item which is not mentioned in the written notice of a special meeting may be considered except upon consent of " all the members of the Board." No such language is used in section 9 and, consequently, when the latter section speaks of " unanimous consent " it must mean unanimous consent of those present at a regular meeting if there is a quorum present.

As pointed out, petitioners also urge that the board did not comply with section 127 of the by-laws in adopting the May 31 resolutions. Section 127 reads: " Specific provisions of these By-Laws may be suspended as to a particular instance or matter or as to particular instances or matters on the calendar, but not generally, by the Board at any meeting by the affirmative vote of five members of the Board, and may, upon like vote be amended at any regular meeting of the Board; but no By-Law or any provision thereof or addition to a By-Law relating to or affecting the time or place of the holding of meetings of the Board, the powers or duties of the Board or of any of its Committees, or Officers of the Board, or any procedural rule or regulation contained herein, shall be amended or suspended unless notice in writing of the proposed amendment or suspension giving the text of the proposed amendment or By-Law to be suspended and the date of the meeting at which the proposal therefor will be presented shall have been given to each member of the Board at least ten days before such meeting, unless all the members of the Board are present at the meeting and consent to the consideration of the amendment or suspension."

It does not appear that the latter part of the above-quoted section applies here for the reason that the resolutions do not affect the time or place of the meetings, the powers or duties of the board or any procedural rules. The resolutions specifically suspend sections 90 and 91 of the by-laws, and consequently the requirements of section 127 that the " specific provisions of these By-laws may be suspended as to a particular instance or as to particular instances or matters on the calendar," have been fully complied with by the board.

Petitioners' third contention that the responsibility for the operation of the school activities program in each particular school has been improperly delegated by these regulations to the principals without adequate safeguards for the teachers, is also untenable. The board of education of the city of New York, pursuant to the powers granted to it by the Education Law, has adopted by-laws for the general management, operation, control, maintenance and discipline of its schools. Sections 89 and 90 of such by-laws direct, among other things, that the principal of each school provide a school activity program beyond classroom instruction for the children. These sections also designate the principal as the official responsible for the efficient operation of the school of which he is the principal. In such respect, the pertinent parts of sections 89 and 90 of the by-laws read as follows:

Section 89. 1. Subject to the supervision of the assistant superintendent assigned in accordance with section 41 of these by-laws, the principal shall be the responsible administrative and pedagogical head of the school, and during the regular school sessions shall be responsible for the instruction, direction and control of all members of the supervising and teaching and custodial staffs constituting the organization of such school. He shall take all proper measures to carry out in his school all requirements of the Board of Education expressed in by-laws, rules, regulations and resolutions, and all instructions issued in pursuance thereof.

Section 90, subd. 20 (a). The principal or person in charge of a school shall be in full charge of all curricular and extra-curricular activities of that school, including those conducted by athletic and other general school organizations. He shall also be in full charge of lunchrooms when operated by the school. He shall direct the teacher in charge of the evening school or classes. Such activities shall be subject to approval and regulation of the principal or person in charge of the school, under such directions, rules and regulations as the superintendent of schools or his designee may make from time to time.

In an affidavit attached to the respondents' answer, the superintendent of schools of the New York City public school system gives a brief history of the school activity program and states that such program has always been an integral part of the educational program of the New York City schools and, further, that the operation of the program has always been the responsibility of the principal of each school. To quote from the Superintendent's affidavit:

As the court is well aware the New York City public school system has for years furnished its pupils an education not only through formal classroom teaching but also by means of a school activity program where the child learned to participate with other children in endeavors which were guided by the teachers. These activities included athletic contests both intra school and inter schools, the running of a school paper, dramatic plays, mathematic, science,

music and various other kinds of clubs, assembly programs, commencement exercises, meetings with parent groups and individual parents, etc. All of these activities coupled with the classroom teaching help to develop the child's aptitudes and teach him to be a good citizen.

The after-school program was carried on in the elementary schools, junior high schools and high schools largely, though not entirely, on a volunteer basis. This system functioned well because each teacher volunteered to help the pupils in the activity which the teacher enjoyed. However, the principals of the schools had the power under Section 90, subd. 20 of the By-Laws to assign a teacher to a certain school activity when volunteers were not available. * * *

The regulations also state that there is an area of teacher service which is important to the well-rounded educational program of the students. This area of service includes the training of dramatic and music groups, leadership of clubs of various kinds, supervision of athletic contests and other school activities, participation in commencement activities, etc.

The principal of each school is charged under the regulations with the responsibility of carrying out this latter part of the school program. This I believe is a sound administrative practice. Each school is of necessity a separate and distinct unit with the principal at its head. He is charged with the efficient operation of the schools. He knows the teachers in his school and is aware of the abilities of the various teachers. The principal is obviously in a far superior position to select a teacher to supervise the school paper, or the school play, or the school athletic contests. It is absurd to suggest that I as Superintendent of Schools having under my jurisdiction some 35,000 teachers could set up rules to govern the selection of these teachers.

A reading of the regulations also discloses that they provide for adequate safeguards for the teachers in a program as flexible and varied as the school activity program. The regulations direct the principals to assign a teacher to only a reasonable amount of service outside of regular classroom instruction and also to see that such assignments, as far as practicable, are equitably distributed. The principal is also obliged to keep records of such service, and if a teacher feels that he is being treated unfairly he may appeal to the assistant superintendent to correct the situation.

The validity of the school activity program adopted by the board of education is amply supported by the conclusions of the Acting Commissioner of the Education Department of the State of New York in *Matter of Halloran,* which was an appeal from a resolution of the board of education of the city of New York requiring teachers to obtain a 1951 Red Cross standard first-aid certificate. The commissioner stated, in part:

Under the provisions of section 2504, subdivision 2, of the Education Law, a board of education has full power to create positions, fill them by appointment and prescribe the duties of the incumbents. It has power to establish regulations and by-laws (subdivision 13 of the same section) for the general management, operation, control, maintenance and discipline of the schools under its jurisdiction and hence, may fix the hours of attendance of school

children and the hours of service of its teachers. The hours of service of its teachers may not necessarily coincide with the hours of classroom instruction, nor is it legally required that the hours fixed be the same for all teachers. The board may authorize the principal or other official in charge of the school to excuse teachers at earlier hours than those contained in the by-laws when their services on a given day are no longer needed. Furthermore, under ordinary circumstances the board, in fixing such laws, is limited to the usual hours of the day. However, I do not hold that there may not be occasions when hours in the evening may be specified if the service can be said to fall fairly within the regular duties of the teacher.

The hours established in any case must be reasonable.

The broad grant of authority to fix "duties" of teachers is not restricted to classroom instruction. Any teaching duty within the scope of the license held by a teacher may properly be imposed. The day in which the concept was held that teaching duty was limited to classroom instruction has long since passed. Children are being trained for citizenship and the inspiration and leadership in such training is the teacher. Of course, it is recognized that any by-law of a board outlining teachers' duties must stand the test of reasonableness. Any teacher may be expected to take over a study hall; a teacher engaged in instruction in a given area may be expected to devote part of his day to student meetings where supervision of such teacher is, in the opinion of the board, educationally desirable. Teachers in the fields of English and Social Studies and undoubtedly in other areas may be expected to coach plays; physical training teachers may be required to coach both intramural and inter-school athletic teams; teachers may be assigned to supervise educational trips which are properly part of the school curriculum. The band instructor may be required to accompany the band if it leaves the building. These are illustrations of some of the duties which boards of education have clear legal justification to require of their employees. A board is not required to pay additional compensation for such services.

The duty assigned must be within the scope of teachers' duties. Teachers may not be required, for instance, to perform janitor service, police service (traffic duty), school bus driving service, etc. These are not "teaching duties". The board may not impose upon a teacher a duty foreign to the field of instruction for which he is licensed or employed. A board may not, for instance, require a *mathematics* teacher to coach intramural teams. Where the service is not part of the duties of the teacher, there is nothing to prevent the board from arranging for such extra service and paying for the same in its discretion. It is pointed out that section 1709, subdivision 16, of the Education Law specifically notes that the board may utilize teachers for playground activities and may pay them extra compensation in so doing.

There are some activities that are part of instruction but, by their very nature, may be performed after the close of the regular school session. The athletic program, for instance, in many instances takes place under such circumstances. It has, nevertheless, over the years been always regarded as part of the school curriculum. (See Commissioner's Regulations, § 155.) As has been heretofore stated in departmental publication, athletic activities are a definite and integral part of the instruction program in physical education. Coaching in athletic sports is teaching. It, therefore, does not follow that because an activity is conducted after regular class hours, it is not part of the regular curriculum.

Finally, our courts have repeatedly enunciated the principle that they will not lightly interfere with the exercise of the functions entrusted by law to the school authorities. In *People ex rel. Peixotto* v. *Board of Education* (212 N. Y. 463) the court stated (pp. 464, 466): " The proceeding of the board of education involved simply a matter of school discipline, and it is not subject to review by mandamus. * * * The general rule is that mandamus will not lie to review the determination of public boards or officers in matters involving the exercise of discretion or judgment, if they have proceeded within their jurisdiction, and in substantial compliance with the forms of law."

So, also, in *Matter of Shapiro* v. *Board of Educ. of City of New York* (250 App. Div. 57), the court stated (p. 59): "Our conclusion is that in a matter within the tutelage of the internal management of the board of education and the discipline of working hours, their length or its lack prescribed for the various teaching staffs, the court ought not to interfere with the authority primarily responsible for the conduct of the schools unless there is palpable discrimination or arbitrary action detrimental to the individual or class."

In the light of the foregoing, I see no reason why this court should disturb the resolutions readopted by the board of education at its meeting of May 31, 1951. Petitioners' application is denied and the petition dismissed.

In making the foregoing disposition, the court reiterates the statement made in open court when the argument came on to be heard: " The court sympathizes with the plight of teachers generally and with their disappointment in not getting the increase in salary which was promised them. However, this motion is not the means by which such increase can be forced and this motion is therefore ill-advised." Settle order on notice.