NANCY LEWIS, Plaintiff-Appellee, v. BOARD OF EDUCATION OF NORTH CLAY COMMUNITY UNIT SCHOOL DISTRICT NO. 25, CLAY COUNTY, Defendant-Appellant.

Fifth District   No. 5—87—0750

Opinion filed April 19, 1989.

S. Jeff Funk, of Miller, Tracy, Braun & Wilson, Ltd., of Monticello, for appellant.

Ralph H. Loewenstein, of Drach & Deffenbaugh, P.C., of Springfield, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, Board of Education of North Clay Community Unit School District No. 25, appeals from a declaratory judgment entered by the circuit court of Clay County entitling plaintiff, Nancy Lewis, to resign her position as the girls' volleyball coach but to continue teaching as a full-time teacher. The court did not award money damages and no cross-appeal was filed on that claim. Defendant raises the following issues on appeal: (1) whether defendant abused its discretion when it assigned extracurricular activities to plaintiff for the 1986-87 school year, and (2) whether the trial court properly admitted parol evidence to explain the language in the contract regarding assignments. This court affirms.

On August 19, 1986, plaintiff filed a declaratory judgment seeking the circuit court to "enter an order declaring the rights of the parties and declaring that the plaintiff be allowed to resign her position as the High School Volleyball Coach and to retain her position as a full time teacher."

On May 11, 1987, the court held a hearing on the motion. Plaintiff presented the following evidence. Plaintiff stated that she was employed by defendant in the fall of 1977 to teach physical education and health for six class periods. She taught approximately 150 students.

During the 1977-78 school term, she not only taught six classes but was also assigned to be the volleyball coach, cheerleading coach, pep club sponsor and GAA (Girls' Athletic Association) sponsor. As cheerleading sponsor, she was responsible for selecting the girls, ordering the uniforms, setting up for practice, attending each ball game and riding on the fan bus. Pep club sponsor was intertwined with the responsibilities as cheerleading sponsor. As a cheerleading sponsor, plaintiff had to attend 20 to 25 boys' basketball games and attend cheerleading practice one to two hours per evening.

As volleyball coach, plaintiff was required to start prior to the season to schedule games and officials. She would receive the Illinois High School Association (IHSA) rules and attend IHSA-sponsored rules interpretation meetings. Before the school term started she would hold practice sessions for two- to three-hour sessions five days a week. Plaintiff was in charge of these sessions and did not have an assistant coach for help. To coach volleyball, she expended 240 to 250 hours and was given $800 in compensation.

When school started, the practice sessions would be after school on nongame days for an hour and a half. The volleyball season lasted 11 weeks, which included 16 to 18 games and two to three tournaments for an approximate total of 25 games. Each game day lasted $4\frac{1}{2}$ to 5 hours. About half of the games were away and required traveling 7 to 50 miles to the other school. For at least five nights a week, plaintiff had coaching responsibilities.

On a typical school day during volleyball season, she would be at school by 8 a.m. and would teach her classes. When school was dismissed at 3:20, she would then set up volleyball nets, get the balls and prepare for practice, which lasted until 5 p.m. After practice ended, she would allow the girls 15 to 30 minutes to gather their things and wait for their rides home. Plaintiff did not leave until all the girls had left. Eventually plaintiff would get home around 6 p.m. At home, she had books to read and papers to grade for her classes.

On the day of a game, when school was dismissed, she was required to stay until 3:40 p.m. When she left, she had to pick up her son, take a shower, eat dinner, spend some time with her family and then leave. She was back at the school between 5 and 5:30 p.m. After an organized practice session, the game would start at 6:30 and last two to three hours. After the games, she was responsible for the equipment, for the statistics, and waiting for the girls to leave. She arrived home at 9:30 or 10 p.m., but then had to wait to talk to the newspaper and report the game statistics.

When plaintiff accepted the cheerleading and volleyball coaching position, she did not have any expertise in either activity. She learned volleyball by reading the IHSA rules book and attending the preseason rules meeting.

On cross-examination, she stated that she had two courses in volleyball while at college and another course in playing softball and volleyball. She did have an offer of an assistant but she refused because the person would not want to do it.

In 1978-79, plaintiff was assigned the same extracurricular activities. By the end of the year, she resigned as cheerleading and pep club sponsor because it worked an extreme hardship on her and the girls deserved better. Plaintiff was allowed to resign and was not required to find a replacement prior to resigning. The school librarian and history teacher was assigned those activities.

However, during the 1979-80 school term, plaintiff was not only assigned as volleyball coach, but also softball coach. Plaintiff did not recall volunteering for the assignment.

Plaintiff had no special expertise in the area of softball. As soft-

ball coach she was again responsible for scheduling games and umpires. She read the current year's rules book and attended the IHSA-sponsored rules meeting. She also prepared the play field for practice or games. The softball season was approximately 10 to 12 weeks with 11 to 12 games plus the regional tournaments. As coach, she ordered uniforms and equipment. She also hauled the equipment to and from the field, supervised and organized practice sessions, coached during the games and attended the Midland Trail Conference meetings. Before the season started, she held softball practice sessions five days a week after school. During the season, for five days a week she was either at a game or at practice. About half of the games are away, ranging from 7 to 50 miles in distance. She expended a total of 100 hours per season for $550 in compensation.

Out of the 36 weeks of the school term, plaintiff devoted 20 to 22 weeks to coaching responsibilities. Plaintiff stated that coaching took a great toll on her marriage and her responsibilities to her son. The only qualification plaintiff understood as necessary for the positions as coach was the willingness to put in the time required to coach the sport. During the 1980-81 school term, she was assigned to coach volleyball and softball. After the 1980-81 school term, plaintiff resigned her position as softball coach. She was not required to find a replacement. Defendant assigned Colleen Webb, the special education teacher, to the position.

During the 1981-82 school term, plaintiff was volleyball coach and freshman class sponsor. As freshman class sponsor, she was involved with fundraisers and all responsibilities associated with that activity.

During the 1982-83 school term, she was volleyball coach and sophomore class sponsor. As sophomore class sponsor, she was involved with fundraisers, monthly meetings and class parties.

During the 1983-84 school term, she was assigned as volleyball coach and junior class sponsor. As junior class sponsor, she was again involved with fundraisers to pay for the prom and the senior trip. As sponsor, she had to attend all home ball games in order to supervise the students while they sold cake and candy and to account for the money. She was also involved with planning and organizing the senior prom as well as decorating, cleaning up and chaperoning.

During the 1984-85 school term, she was assigned as volleyball coach and senior class sponsor. As a senior class sponsor, she was involved with the fundraising for the senior class trip, graduation preparation, selling popcorn at all home ball games, a cake raffle, coat check and planning the homecoming dance. She also planned and accompanied the seniors on the class trip, which was six days in Florida.

For the 1985-86 school term, she was assigned to coach both volleyball and softball. She received notice of the assignments in the first part of August. She called the principal, Robert Strotzum, to see if a mistake had been made. He said that he thought the volleyball program was for one year and that she would be softball coach.

Around the first of March of 1986, she submitted her letter of resignation as coach to defendant and to the principal. She felt at that time not only that the program needed a change but also plaintiff and her family needed a change. The principal responded that coaching a girls' sport should be handled by the girls' physical education teacher and told her that if the basketball coach resigned she would also acquire that assignment. She then wrote to defendant. Richard Sealman responded that he would have the principal find out if any fellow teachers were interested. However, the principal told Sealman that none of the teachers wanted the position. Defendant wrote that since it had the power to assign, it would assign her to the position again. Thus, during the 1986-87 term, she was assigned as volleyball and softball coach as well as sophomore class sponsor. Again, she submitted a resignation letter regarding her position as volleyball coach for the 1987-88 school term. She did not receive any response from defendant.

Since 1977, plaintiff was volleyball coach for 10 terms, softball coach for four terms, class sponsor for four terms, and GAA, cheerleading and pep club sponsor for two years each. Besides these assignments, she had the same extra duties that all other teachers shared, which included supervising a specified area before school started each day, selling lunch tickets on Monday mornings, punching lunch tickets as the students went through the line, supervising detention hall and having a homeroom during activity period. Although by the end of the day during season she was exhausted, she still had to prepare classes for the next day.

Plaintiff stated that there were other activities that did not require the hours or require time after school, but could be done during school hours. These activities included, but were not limited to, Spanish Club, Industrial Arts, Business Club, Honor Society and Drama Club. Coaching monopolized so much of her time during the school term that she was unable to pursue education beyond her bachelor's degree. In effect, her salary could not be increased without a master's degree.

On cross-examination, she stated that the principal told her that if she could find someone as a replacement, he would consider her resignation. Plaintiff did ask around but no one was interested. She stated,

however, that she does not have the authority to require another teacher to be a coach of a sport or to do an extracurricular activity. She stated that she was aware that the collective bargaining agreement for 1986-88 contained a clause which stated that defendant had the discretion to fill assignments for extracurricular activities.

Richard Sealman, the superintendent of North Clay Community Unit School District No. 25 since 1972, stated that he could assign any teacher to any extracurricular duties and had the discretion to allow certain persons not to resign their positions. When those teachers resigned, he did not require them to find replacements as he did plaintiff. During the 1985-86 school year, 28 full-time teachers were not assigned to any extra duties, and during the 1986-87 term, 29 full-time teachers were without assignments. Two of the teachers not assigned to any extra duties were Sandra and Charles Strotzum, the brother and sister-in-law of the principal. Sealman stated that nothing would disqualify the Strotzums from being assigned extracurricular duties.

In the past, Sealman assigned grade school and junior high school teachers to extra duties at the high school. He admitted that there are no written job descriptions or qualifications for any coaching positions and that teachers have been assigned coaching positions without having any prior experience or training. The only qualification for a coaching position is a teaching certificate. The teacher assigned does not have to be employed full time as a teacher in the district, and he has assigned such teachers to positions. He stated that there were qualified physical education teachers at the grade school who were not assigned extra duties. Sealman admitted that after plaintiff filed this lawsuit, her position was reduced to half time while a less senior teacher remained full time. It was not until after plaintiff's attorney wrote a letter demanding reemployment to full time was plaintiff reinstated to full time.

Cheri Burkett, a teacher for Johnsonville School in the North Wayne School District, stated that prior to the present position she was employed from fall 1980 to summer 1986 as a part-time teacher by the Flora School District. She does have a teaching certificate and coached volleyball for 5½ years for the Flora School District. Her responsibilities as volleyball coach were similar to those of plaintiff.

In July of 1986, she applied for plaintiff's volleyball coaching position. About two weeks before practice began, she contacted the principal, Robert Strotzum, by telephone and told him that she was a certified teacher with experience coaching volleyball. The principal responded politely and stated he would take the information into con-

sideration and would contact her later. When the principal did not call her back, she called him back 1½ to 2 weeks later. He told her that plaintiff would be keeping her duties for the next year.

Burkett stated that there were neither problems with her being a volleyball coach and not a full-time teacher in defendant's school district nor problems with her being available for the times required for coaching. She told Strotzum that the principal of her school district did not have problems with her being a coach in another school district.

Monty Aldrich was a teacher and an assistant basketball coach at Olney Central College. From December 1985 through March 1986, he was an assistant coach for North Clay High School. He was not a full-time teacher at the school, but rather a substitute teacher for the district. Prior to the job he had not played college basketball or served as a basketball coach.

Darren Sheehan, a certified teacher in Flora, was an assistant basketball coach from 1986-87 for North Clay High School. During that time, he was a substitute teacher for North Clay and Flora School District. His only experience coaching was as a student teacher when he volunteered to be an assistant coach for the eighth grade at Flora Junior High. He had no other experience and his teaching certificate was in social sciences.

Nick Veremis, a certified teacher for North Clay School District, stated that he teaches junior high school physical education and is the physical education supervisor for grades two through six. He also stated that when he had served as the girls' high school basketball coach in the 1983-84 season, he was employed in the junior high school. He stated that he had no problems or conflicts with his position as coach and teacher. He also named two other teachers who were coaches at the high school while being employed at the junior high or grade school level.

Carolyn Dawkins, a certified teacher for North Clay, stated that she teaches American history, political science, and American problems. She was assigned to coach softball from 1981 to 1985. When she accepted the coaching position, she did not have any experience in playing or coaching softball. She learned about softball through the rules and regulations book and attending a preseason interpretation of the rules sponsored by the IHSA. Prior to volunteering for the coaching position, no one asked her about her qualifications. She resigned her position as coach in April of 1985 because she was not able to devote time to her classes. She was not required to find a replacement, and defendant permitted her to resign.

Kent Lewis, a certified teacher at North Clay, stated that he teaches chemistry, physical science, and drivers' education. He also coaches girls' basketball with the help of an assistant. From 1968 to 1971, he coached boys' baseball and basketball. From 1974 to 1982, he coached boys' basketball and cross-country. He resigned twice from basketball in 1971 and in 1982 because of personal reasons. In 1982 he was allowed to resign after the boys' basketball season began. He was not required to find a replacement and defendant permitted him to resign.

Norma Henning, a certified teacher with North Clay, stated that she is the librarian and teaches world history and twentieth century American history. Her extracurricular assignments have included three class plays and class sponsor for four years. From 1979 through 1984, she was a cheerleading sponsor. Her only experience in cheerleading was in the seventh grade. She learned cheerleading by reading books and from the girls. When she resigned, she was not required to find a replacement. Defendant accepted her resignation. Defendant then assigned a nonteacher to the position as cheerleading sponsor.

Defendant then presented its witnesses. The first was Richard Sealman, superintendent of the school district. He stated that the contract language regarding the assignment of extracurricular activities means that defendant has the right to assign reasonable extracurricular duties against the teacher's wishes. However, when the contract was negotiated, Sealman was not the spokesperson and as such he would not be aware of any other understandings regarding that language.

Robert Strotzum, a principal with the school district for seven years, stated that he makes the teaching assignments as well as the teaching schedules for the academic year and the extracurricular assignments. He does not give extracurricular assignments to grade school or junior high school teachers. He stated that his assignments for extracurricular duties are based on expertise in the particular area as well as educational background, prior training, and prior experience. He also takes into account teaching assignments. If there is no one with the expertise, he will look within the community. However, very few people volunteer for these assignments.

When plaintiff told him that she wanted to resign, he began a search. He initially put announcements in the teachers' mailboxes regarding the possible vacancy. When he received no responses, he approached the teachers and asked if they were interested but no one was interested. When he had contact with Cheri Burkett late in the

summer about the volleyball coaching position, practice had already started. He mainly discussed with Burkett the problems she might have in meeting the responsibilities of coaching since she lived in a neighboring town and worked in another town farther away. He wondered if she would be able to make practice sessions and games. When she called back, he told her that it would not be in the best interests of the school to hire her. In previous years, he offered plaintiff an assistant, but she said she was not interested.

Strotzum read the qualifications for coaches from the IHSA book for 1986-87, which provided, in part:

"Athletic coaches must be regularly certified to teach in the schools of Illinois and be:

(a) regularly employed teachers doing at least two periods of teaching or classroom supervision daily in the member school; or

(b) teachers who are employed full-time in any of the elementary or junior high schools in the same attendance area of the member school; or

(c) assistant teachers, resource aides, lay supervisors, or other paraprofessionals who are employed at least half-time per day in the member school; or

(d) teachers who are employed full time in any elementary district, any of whose territory is a part of the high school district.

(e) *If a member school is unable to fill a coaching position under the terms of items a, b, c or d* above with personnel acceptable to its Board of Education or governing board, *it may*, with the approval of the IHSA Board of Directors, *employ a regularly certified teacher who is not otherwise employed in the member school.*" (Emphasis added.)

Strotzum admitted that defendant could assign grade school or junior high school teachers to perform extra duties at a high school and could assign duties to teachers who did not want them. He also stated that the junior high and grade school teachers are on the same salary schedule as the high school teachers. Nonetheless, he stated that he believes a teacher must have some expertise in the sport to which he or she is assigned. This qualification, however, was not necessary when he assigned Carolyn Dawkins to coach softball because she volunteered. He admitted that there would be no reason why a person who has a teaching certificate could not be a coach. He stated further that there are no job descriptions or specific qualifications beyond a teaching certificate in order for a person to coach. There are no rules

regarding exactly when practice sessions must begin or end.

■ The crux of the issue on appeal is whether or not the defendant abused its discretion in assigning plaintiff to coach volleyball for the 1986-87 school term and in refusing to let her resign. Defendant contends that it has the discretion to make extracurricular assignments. Plaintiff argues that defendant may not assign a teacher to extra duties which are unreasonable, overly burdensome or discriminatory. Both parties agree that the controlling case is *District 300 Education Association v. Board of Education* (1975), 31 Ill. App. 3d 550, 334 N.E.2d 165.

In *District 300*, the plaintiffs alleged that assignments to nonacademic duties such as supervision at football and basketball games, pep rallies and music programs not only bore no reasonable relationship to the contractual duties but were also not reasonable. Since no other case had addressed the question, this court followed *Parrish v. Moss* (1951), 200 Misc. 375, 106 N.Y.S.2d 577. In *Parrish*, the New York Supreme Court stated:

> "The hours established in any case must be reasonable. The broad grant of authority to fix 'duties' of teachers is not restricted to classroom instruction. Any teaching duty within the scope of the license held by a teacher may properly be imposed. The day in which the concept was held that teaching duty was limited to classroom instruction has long since passed. Children are being trained for citizenship and the inspiration and leadership in such training is the teacher. Of course, it is recognized that any bylaw of a board outlining teachers' duties must stand the test of reasonableness." (106 N.Y.S.2d at 584.)

In view of *Parrish*, this court held that the assignments complained of were not onerous in nature nor unreasonably time-consuming. This court found that the assignments were not demeaning to the professional stature of the teachers and were not made in a discriminatory way. Thus, this court held that the assignments were reasonably related to the teaching duties and were within the discretion of the board and the administration to assign.

Defendant cites numerous cases from other jurisdictions for the proposition that the assignment of extracurricular duties for teachers is within the discretion of the board. Defendant also argues that these cases hold that a board may not impose duties on a teacher which are unrelated to the teacher's teaching duties.

After reading the cases, this court finds that the central issue in each of the cases cited is whether the board assignments were reasonable. In answering this question, we must look at the facts of the situa-

tion. As stated in *Board of Education v. Asbury Park Education Association* (1976), 145 N.J. Super. 495, 368 A.2d 396,

> " '[T]he extra assignment must be *reasonable*: it (1) must not require excessive hours beyond the normal teaching period; (2) must have some relation to the teachers' interests, abilities and certification; (3) must be made with a purpose beneficial to pupils; (4) must not be discriminatory; and (5) must be professional in nature.' " (Emphasis in original.) (145 N.J. Super. at 500-01, 368 A.2d at 398-99, quoting E. Bolmeier, Teachers' Legal Rights, Restraints & Liabilities §9.7, at 125 (1971).)

Although the abovementioned factors are numerous, this court is not limited to those factors alone because each case must be reviewed individually. In this case, we find that defendant acted arbitrarily and unreasonably.

Plaintiff had been burdened not only with the same everyday assignments that all the teachers share but also extra duties which require more of her time outside of the classroom. While it was not unreasonable to assign plaintiff to coach a sport, it was unreasonable to burden her with more than one coaching position. The school district in this case is very small. The number of qualified candidates to take a coaching position is very limited. No doubt when the IHSA rules were written regarding who is qualified to be assigned to such positions, it did not want to restrict the school to a select group. The only qualification necessary is an Illinois teaching certificate. To limit a school district of defendant's size to anything more would create an undue hardship on the school district. A small school district, as in this case, would find it very hard to fill a physical education teacher's position or to have such a teacher for any extended period and as such the sports program would have a very high turnover.

Moreover, defendant did not establish that assigning the volleyball and softball positions to plaintiff, and potentially also basketball assignments, was reasonable. Quite to the contrary, defendant revealed that it did not have any established pattern of how it assigned the extra duties, to whom it assigned a duty or who was allowed to resign. In some of the larger school districts where there are numerous physical education teachers, it would not be unreasonable for the board to assign coaching positions to those teachers only. However, as defendant's past history regarding all of its assignments reveals, such a restriction to coaching positions in this case would be a hardship. In a situation such as this, defendant should realize that it is better to have a teacher willing to accept the position, to learn all there is about the sport and to be interested in the students, rather than a teacher who has either

no interest in the position or no longer has the enthusiasm to benefit the students. The utmost concern must be the benefit of the students and not defendant's ability to assign. Thus, this court finds that the trial court properly entered an order for declaratory relief for plaintiff.

Defendant's last issue on appeal is whether the trial court properly allowed extrinsic evidence to explain the meaning of the contract clause at issue. Defendant argues the contract between it and the teachers' union regarding the assignment of extracurricular activities was not ambiguous. Defendant specifically argues that since the assignment of extra duties is for the board, the contract was not ambiguous and represented the full and complete understanding between the parties. Defendant's argument concerns the testimony of Michael Hindmann, Uni-Serv Director of the Illinois Education Association.

Hindmann stated that he works with the local teachers' association in a geographic area assisting them to negotiate contracts, enforce the contracts and other supportive activities. He is responsible for the North Clay School District, was involved in the first written master contract negotiated for 1984 through 1986 and the second contract for 1986-88, and was the spokesperson for the bargaining team.

Hindmann testified that both contracts as negotiated stated that extracurricular assignments would be filled at defendant's discretion. He then explained:

"The [teachers'] association attempted to negotiate into the contract language that would make it very clear that extracurricular activities were voluntary and that the teachers could be allowed to volunteer for those positions and not be required to accept them and likewise, if they were going to be removed from them they ought to be removed for good reason and not just the whim of the Board."

Since defendant was not willing to agree to that language in the contract, the parties agreed to leave the contract silent regarding whether teachers had a unilateral right to deny these duties. When Hindmann was asked whether the language in the contract gave defendant the right to make extracurricular assignments, counsel for defendant objected that the question and previous line of questioning were impermissible parol evidence. Plaintiff's counsel argued that since the contract language was ambiguous, parol evidence was admissible. The court overruled the objection.

Hindmann then stated:

"In my mind this language did not give the Board the unilateral power to assign teachers to do any of these duties on the list."

He stated that by the contract being silent on the subject of extracur-

ricular activities, it protected defendant from being required to fill all of the positions listed in the contract when there were financial problems because defendant wanted to be free to eliminate any of the positions.

■ It is well established that when a contract is ambiguous, parol evidence may be introduced to aid in its interpretation. A contract term is ambiguous when it is reasonably capable of being understood in more senses than one because the language or expression is not definite or due to the term having a double or multiple meaning. However, the mere fact that the parties take a divergent view of the meaning of the contract language does not render the agreement ambiguous. (*Zurich Midwest, Inc. v. St. Paul Fire & Marine Insurance Co.* (1987), 159 Ill. App. 3d 961, 963, 513 N.E.2d 59, 60.) In this case, the contract language in question is, "These positions will be filled at the Board's discretion."

■ By itself the language seems easily understood, but its application is far from a simple understanding. The ambiguity exists in the word "discretion." Does that discretion exist only in assigning all of the positions, only in assigning some of the positions, or does it relate to assigning the position to whomever defendant chooses? These varied meanings are reasonable interpretations because it is unlikely that the teachers' union agreed to permit defendant unlimited discretion in assigning extra duties. On the other hand, it is unlikely defendant's discretion relates only to the assignment power but not to the number of assignments. The trial court properly determined that the contract language was ambiguous.

Even if the language is susceptible to only one meaning—that defendant has absolute discretion in assigning extra duties—that power is not without limitation. As discussed in the previous issue, defendant cannot assign duties which are unreasonable, onerous, burdensome or make assignments in a discriminatory manner. In this case, defendant acted unreasonably in its assignments to plaintiff and its refusal to accept her resignation. This court finds that the trial court properly admitted extrinsic evidence to explain the contract language in question.

For the foregoing reasons, the judgment of the circuit court of Clay County is affirmed.

Affirmed.

CHAPMAN and RARICK, JJ., concur.