PRAIRIE LAND CONSTRUCTION, INC., Plaintiff-Appellant, v. THE VILLAGE OF MODESTO, Defendant-Appellee.

Fourth District   No. 4—90—0439

Opinion filed May 16, 1991.—Rehearing denied June 11, 1991.

Stuart Dobbs and Barbara B. Collins, both of Stratton, Dobbs, Nardulli & Lestikow, of Springfield, for appellant.

Richard J. Bertinetti and Brent A. Cain, both of Bertinetti & Cain, of Carlinville, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Plaintiff Prairie Land Construction, Inc. (Prairie Land), entered into a contract with the Village of Modesto (Village) for the construction of a water line. After the project had been substantially completed, the Village reported to Prairie Land what appeared to be a leak in one of the water pipes it installed. A Prairie Land employee viewed the scene of the suspected leak the day it was reported. After various Prairie Land employees and equipment arrived at the scene on the following day, a Prairie Land employee "shut the main down" and "bled the pressure," which revealed there was no leak. For this

Prairie Land billed the Village $1,158.50. The circuit court held Prairie Land was entitled to only $114 and entered judgment against the Village in that amount. Prairie Land appeals, and we affirm.

An invoice attached to Prairie Land's small claims complaint provides the following itemization of the amount which Prairie Land claimed:

March 16, 1989

| | | |
|---|---|---|
| Send lowboy to Gillespie (from Prairie Land's Virden shop) to get backhoe | 3 hours at $50 | $150 |
| Send Bill Garrison (pipefitter) to Modesto to locate any other utilities in area of leak | 3 hours at $38 | $114 |
| Sheldon Black, superintendent (making phone calls, organizing men and equipment to go to scene of supposed leak) | 1 hour at $45 | $ 45 |

March 17, 1989

| | | |
|---|---|---|
| Haul backhoe on lowboy (from Virden) to and from Modesto (to Virden) | 2.5 hours at $50 | $125 |
| Return backhoe (on lowboy) to Gillespie (from Virden) | 3 hours at $50 | $150 |
| Time lost (by backhoe and backhoe operator) on Gillespie job | 5.5 hours at $45 | $247.50 |
| Bill Garrison, pipefitter | 4 hours at $38 | $152 |
| Don Tigo, laborer | 4 hours at $32.50 | $130 |
| Sheldon Black, superintendent | 1 hour at $45 | $ 45 |
| | | $1,158.50 |

At the bench trial of this cause, Peter Libbra, Prairie Land's president, testified the firm had a contract to construct a water line in the Village of Modesto, and that in March 1989, the job was substantially complete and was under warranty. He stated that on March 16, 1989, the Village reported a water leak to Prairie Land. The official who contacted Prairie Land indicated the leak was not an emergency and

the repairs could wait until the next morning. On March 16, Bill Garrison, a Prairie Land employee, went to Modesto to determine the location of the supposed leak and to find out if any other utilities would have to be notified of the repair work. Libbra further testified the closest backhoe belonging to Prairie Land was at Gillespie, where Prairie Land was constructing a sewer plant, and on March 16, Prairie Land sent a laborer to Gillespie to transport the backhoe to Prairie Land's shop at Virden.

Libbra stated that on the following morning, a backhoe operator, a pipefitter, and a laborer, who were Prairie Land employees, went to Modesto to fix the supposed leak. Libbra stated the charges for the time of Sheldon Black, superintendent, were attributable to "organizing the men and machines for [the repair] project [at Modesto]."

Libbra also testified the charges for the services for which Prairie Land claimed reimbursement were "consistent with prices in relation to the bid which [Prairie Land] made to the Village of Modesto." In his testimony, Libbra suggested that if there had been a leak in the water line on March 16, and Garrison had shut down the nearest valve short of the leak, the individuals served by the water line would not have been able to use water until Prairie Land's employees arrived the next morning to repair the leak.

On cross-examination, Libbra stated (1) he did not know whether the backhoe was being used in Gillespie on March 16, 1989, and (2) he did not have to call in another backhoe for the Gillespie job on March 17.

Also testifying on Prairie Land's behalf was Bill Garrison. He testified that on March 16, 1989, he was the first Prairie Land employee to be notified of the suspected water leak in Modesto. He testified that after being notified of the suspected leak during the midafternoon of March 16, he contacted Sheldon Black, who said he would line up the crew for the next morning. On Black's instructions, Garrison went to Modesto and inspected the supposed leak. Upon arriving at the site of the suspected leak, he noticed that in a ditch located over a water line, "there was water bubbling up quite profusely." Because of the possibility of disrupting service to customers on the water line, Garrison did not shut off the line in order to determine whether a leak actually existed. Garrison testified that on the following day, the water main was shut down, but the water kept bubbling. This established the bubbling water was not being caused by a leak in the main.

At trial, a portion of the contract between Prairie Land and the Village for construction of the water line was admitted into evidence. This contract provides, in pertinent part:

"d. Should it be considered necessary or advisable by the Local Public Agency at any time before final acceptance of the entire work to make an examination of work already completed by uncovering the same, the Contractor shall on request promptly furnish all necessary facilities, labor, and material. If such work is found to be defective in any important or essential respect, due to fault of the Contractor or his subcontractors the Contractor shall defray all the expenses of such examination and of satisfactory reconstruction. If, however, such work is found to meet the requirements of the Contract, the actual cost of labor and material necessarily involved in the examination and replacement, plus 15 percent of such costs to cover superintendence, general expenses and profit, shall be allowed the Contractor and he shall, in addition, if completion of the work of the entire Contract has been delayed thereby, be granted a suitable extension of time on account of the additional work involved."

After taking the cause under advisement, the circuit court entered a written order, which provided in part:

"Court finds that upon the plaintiff being notified of the possibility of a leak it became the responsibility of the plaintiff to determine whether or not work was or was not required. Court further finds the facts of this case show that no actual work or equipment was required to remedy the problem that was thought to exist. It is therefore ordered that the defendant be responsible for only that time and labor involved in order for the plaintiff to have an adequate opportunity to make a determination as to whether or not work was or was not required. Court finds that time to be 3hrs [sic] for Bill Garrison in the amount of $114.00 on March 16, 1989. All other costs and expenses incurred by the plaintiff are disallowed as part of the plaintiff's claim."

Accordingly, the court entered judgment in favor of Prairie Land in the amount of $114.

Prairie Land argues on appeal that under the unambiguous terms of the parties' contract, it is entitled to the full amount for which it billed the Village, and the circuit court in effect rewrote the parties' contract in holding it is entitled to less. Prairie Land states there is no basis for concluding Garrison should have shut down the water line on March 16 and thus risked disrupting service to customers served by the line. Prairie Land asserts instead that it acted reasonably in doing this on March 17, when it was in a position to immediately re-

pair any leak which it discovered, thus ensuring customers would be without water for the shortest possible time. Prairie Land finally argues the various components of the total amount which it billed the Village are reasonable charges for services rendered and states the Village presented no evidence which establishes these charges were unreasonable.

The Village asserts before bringing a crew and equipment to Modesto, Prairie Land should have performed some perfunctory tests to ascertain whether a leak existed. The Village also contends that before committing men and equipment, Prairie Land should have informed Village officials of the probable amount of expenses it would incur if no leak was discovered. The Village further argues the court did not rewrite the parties' contract, but rather, the expenses which the court disallowed were not "necessarily" incurred in the examination of the pipe for the suspected leak under the language of the contract. Also, the Village asserts the amount claimed by Prairie Land includes overcharges and is not supported by adequate time records.

In its reply argument, Prairie Land contends it was only required to establish it moved its equipment and crew to the site of the suspected leak in furtherance of the parties' contract, and it was not required to establish its. actions were reasonable *per se*. Prairie Land further asserts in a situation such as is involved in the present case, it has no incentive to bring a greater amount of men or equipment to the site of a suspected leak than is necessary, because if there is a leak which was caused by faulty materials or workmanship, it bears the entire cost of responding to the leak. Prairie Land maintains there was no need for it to consult with Village officials regarding the costs the Village might incur in advance of responding to the suspected leak, since the matter of costs was already clearly spelled out in the parties' contract. Prairie Land points out the circuit court apparently concluded the charges billed for March 17, 1989, were not recoverable, as opposed to being unreasonable, and maintains if this court takes a different view, we should remand this cause for further proof of damages under appropriate directions.

The contractual language here at issue, or similar language, is apparently used in many government construction contracts. (See, *e.g., Stoeckert v. United States* (1968), 183 Ct. Cl. 152, 391 F.2d 639; *Len Co. & Associates v. United States* (1967), 181 Ct. Cl. 29, 385 F.2d 438; *Roberts v. United States* (1966), 174 Ct. Cl. 940, 357 F.2d 938.) Curiously, though, there appear to be no cases interpreting this language as it applies to a situation similar to that here present.

■ As noted by Prairie Land, the intent of the parties to an unambiguous contract must be determined solely from the words of the contract. (*Village of Grandview v. City of Springfield* (1984), 122 Ill. App. 3d 794, 461 N.E.2d 1031.) A contract is ambiguous if its words are capable of being understood in more than one sense, either because of indefiniteness of expression or because a double meaning is attached to the words. (*Village of Grandview*, 122 Ill. App. 3d 794, 461 N.E.2d 1031; *Joseph v. Lake Michigan Mortgage Co.* (1982), 106 Ill. App. 3d 988, 436 N.E.2d 663.) If a contract is ambiguous, parol evidence may be considered in interpreting it. *Lewis v. Board of Education of North Clay Community Unit School District No. 25* (1989), 181 Ill. App. 3d 689, 537 N.E.2d 435.

■ We hold the above-quoted portion of the parties' contract is ambiguous, because the words "necessarily involved in the examination and replacement" are capable of being understood in more than one sense. These words may mean the labor necessarily involved in examining a water system for a suspected defect includes having a complete crew and the requisite equipment present when a suspected water leak is investigated, so repairs may begin immediately upon discovery of a leak and disruption of water service may be held to an absolute minimum. On the other hand, these words may mean having a complete repair crew and equipment present when a water system is examined for a suspected defect is not labor necessarily involved in examining the system, so long as a repair crew and equipment can be obtained in a reasonable amount of time after discovery of a defect. Prairie Land presented no evidence concerning industry or trade practices with regard to this matter, nor any other evidence which sheds light on the meaning of this ambiguous term of the parties' contract. Thus, Prairie Land did not sustain its burden of establishing it has a contractual right to recovery of the entire amount claimed.

In addition to the lack of evidence as to whether all of the amounts claimed by Prairie Land were "necessarily involved in the examination and replacement" of the supposedly defective water line, there is an additional basis, not discussed by the parties, on which we may nevertheless affirm the circuit court's judgment. See *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 457 N.E.2d 9; *Computer Teaching Corp. v. Courseware Applications, Inc.* (1989), 191 Ill. App. 3d 203, 547 N.E.2d 718.

■ The first sentence of the previously quoted paragraph of the parties' contract requires the contractor to "promptly furnish all necessary facilities, labor, and material" if, before final acceptance of the entire work, the Village considers it necessary to make an examina-

tion of the previously completed work "by uncovering the same." The remaining two sentences of this paragraph state the factors controlling the determination of who is responsible for the costs of any such examination. According the language of this paragraph its plain and obvious meaning (*Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 458 N.E.2d 480), the portions thereof which allocate responsibility for costs apply only when the Village requires the uncovering of a portion of previously completed work.

Here, there is no evidence (1) the employees which Prairie Land sent to Modesto to inspect the supposed leak at any time uncovered or excavated any portion of the water lines which Prairie Land installed, or (2) Prairie Land's employees were specifically directed or advised by the Village to do so. It follows Prairie Land is not entitled to recover damages under the contractual language on which it relies, and Prairie Land asserts no grounds for recovery other than the quoted contractual language.

■ The Village has not cross-appealed the judgment in the amount of $114 which the circuit court entered in Prairie Land's favor. Therefore, although the pertinent contractual language arguably affords Prairie Land no basis for recovery, we must affirm the judgment entered against the Village.

Affirmed.

SPITZ and GREEN, JJ., concur.